## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CLIFF MALBROUGH**                                              **CIVIL ACTION**

**VERSUS**                                                                **NO. 18-8391**

**DARREL VANNOY, WARDEN**                          **SECTION: "M"(3)**

## REPORT AND RECOMMENDATION

Petitioner, Cliff Malbrough, a Louisiana state prisoner, filed this federal habeas corpus application seeking relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

### I. Procedural History

#### A. Proceedings in the Louisiana State Courts

A grand jury indictment charged petitioner with stalking (Count 1), felony carnal knowledge of a juvenile (Count 2), sexual battery (Count 3), and aggravated rape (Count 4).[1] The state later filed a motion to amend that indictment to correct a clerical error,[2] and that motion was granted.[3] In 2013, petitioner pleaded guilty to Count 2,[4] and he was convicted by a jury on the remaining counts.[5] He was then sentenced as follows: one year on Count 1; seven years on Count 2; seven years

---

[1] Rec. Doc. 25, p. 4.
[2] Rec. Doc. 25, pp. 228-29.
[3] Rec. Doc. 25, pp. 132-36; *see also* Rec. Doc. 25, p. 3.
[4] Rec. Doc. 25, pp. 57, 77, and 1002-10.
[5] Rec. Doc. 25, pp. 78-79 and 1518.

without the benefit of probation, parole, or suspension of sentence on Count 3; and life without the benefit of probation, parole, or suspension of sentence on Count 4. It was ordered that those sentences be served **consecutively**.[6] The Louisiana First Circuit Court of Appeal thereafter affirmed his convictions and sentences,[7] and he did not seek further direct review by filing a related writ application in the Louisiana Supreme Court.[8]

In 2015, petitioner then filed an application for post-conviction relief in the state district court.[9] That application was "granted for the sole purpose of considering his motion to reconsider sentence" and that motion was set for hearing; the application was denied in all other respects.[10] The court thereafter disposed of the motion to reconsider sentence by granting the limited relief of amending the sentence on Count 4 to run **concurrently** with the remaining sentences.[11] Petitioner's related writ applications were then denied by the Louisiana First Circuit Court of Appeal[12] and the Louisiana Supreme Court.[13]

---

[6] Rec. Doc. 25, pp. 80 and 126.
[7] Rec. Doc. 25, pp. 342-49; *State v. Malbrough*, No. 2013 KA 2190, 2014 WL 3843879 (La. App. 1st Cir. Apr. 25, 2014).
[8] *See* Rec. Doc. 5, p. 2, Answer to Question 9(g).
[9] Rec. Doc. 25, pp. 455-509.
[10] Rec. Doc. 25, pp. 614-72.
[11] Rec. Doc. 25, p. 776.
[12] Rec. Doc. 25, p. 805; *State v. Malbrough*, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).
[13] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).

In the interim in 2017, petitioner filed a second application for post-conviction relief.[14] The state district court denied his application,[15] the Louisiana First Circuit Court of Appeal denied his related writ applications,[16] and the Louisiana Supreme Court refused to consider his writ application because it was not timely filed.[17]

Also in 2017, petitioner filed a motion to correct illegal sentence.[18] That motion was denied by the state district court,[19] and his related writ applications were also denied by the Louisiana First Court of Appeal[20] and the Louisiana Supreme Court.[21]

**B. Proceedings in Federal Court**

In 2018, petitioner filed the instant federal application[22] and a motion asking that the federal proceedings be stayed while he exhausted his remedies in the state courts.[23] United States Magistrate Judge Michael B. North issued a report recommending that the motion to stay be granted.[24] Adopting that Report and Recommendation, United States District Judge Martin L.C. Feldman granted the motion, stayed these proceedings, administratively closed the case, and ordered that

---

[14] Rec. Doc. 25, pp. 699-736.

[15] Rec. Doc. 25, pp. 1536-43.

[16] Rec. Doc. 25, p. 1551-52; *State v. Malbrough*, No. 2022 KW 1378, 2023 WL 2663408 (La. App. 1st Cir. Mar. 27, 2023); *State v. Malbrough*, No. 2023 KW 0390, 2023 WL 4559870 (La. App. 1st Cir. July 17, 2023).

[17] Rec. Doc. 25, p. 1553; *State v. Malbrough*, 373 So. 3d 445 (La. 2023).

[18] Rec. Doc. 25, pp. 796-97.

[19] Rec. Doc. 25, p. 798.

[20] Rec. Doc. 25, p. 835; *State v. Malbrough*, No. 2017 KW 1557, 2018 WL 776866 (La. App. 1st Cir. Feb. 8, 2018).

[21] Rec. Doc. 25, p. 917; *State v. Malbrough*, 267 So. 3d 84 (La. 2019).

[22] Rec. Doc. 5.

[23] Rec. Doc. 6.

[24] Rec. Doc. 13; *Malbrough v. Vannoy*, Civ. Action No. 18-8391, 2019 WL 506489 (E.D. La. Jan. 1, 2019).

petitioner move to reopen this matter "within thirty (30) days after finality of all state post-conviction review through the Louisiana Supreme Court related to the unexhausted claims presented in his federal petition that are currently pending before the state courts."[25]

In 2023, petitioner filed a motion requesting that the stay be lifted.[26] United States District Judge Barry W. Ashe granted that motion, lifted the stay, reopened the case, and referred the matter to the United States Magistrate Judge for further proceedings.[27] The state then answered petitioner's federal application,[28] and the matter was transferred to the undersigned.[29] Petitioner thereafter replied to the state's answer.[30]

## II. Timeliness

In its answer, the state asserts: "While the initial filing of the petition seeking habeas corpus relief was timely, the State respectfully submits that the motion to lift the stay was not."[31] The state argues that, under Judge Feldman's order granting the stay, petitioner needed to file his motion to lift the stay within thirty days of the Louisiana Supreme Court's 2019 decision about his **first** state post-conviction application. That argument lacks merit.

---

[25] Rec. Doc. 14; *Malbrough v. Vannoy*, Civ. Action No. 18-8391, 2019 WL 498973 (E.D. La. Feb. 8, 2019).
[26] Rec. Doc. 15.
[27] Rec. Doc. 18. The case had been reallotted to Judge Ashe after Judge Feldman's death. Rec. Doc. 16.
[28] Rec. Doc. 20.
[29] Rec. Doc. 24.
[30] Rec. Doc. 29.
[31] Rec. Doc. 20, p. 10.

Judge Feldman ordered that the motion to reopen was to be filed "within thirty (30) days after finality of all state post-conviction review through the Louisiana Supreme Court related to the unexhausted claims presented in his federal petition that are currently pending before the state courts."[32] And even though Claims 1-13 in petitioner's federal application were asserted in his first state post-conviction application, Claim 14 was asserted in his **second** state post-conviction application. Therefore, by the terms of Judge Feldman's order, petitioner needed to file his motion to reopen these federal proceedings within thirty days after the Louisiana Supreme Court ruled on that second application. Given that he filed his motion to reopen with thirty days of the Louisiana Supreme Court's 2023 decision on the second state post-conviction application, the Court finds that the motion to reopen was timely filed.

Because the state concedes that petitioner's original federal application was timely filed, and because the Court finds that his motion to reopen was timely filed, this matter is properly before the Court.

## III. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "AEDPA recognizes a foundational principle of our federal system: State

---

[32] Rec. Doc. 14; *Malbrough v. Vannoy*, Civ. Action No. 18-8391, 2019 WL 498973 (E.D. La. Feb. 8, 2019).

courts are adequate forums for the vindication of federal rights, and AEDPA therefore demands that state-court decisions be given the benefit of the doubt." *Mejia v. Davis*, 906 F.3d 307, 314 (5th Cir. 2018) (citations and quotation marks omitted).

To that end, the AEDPA incorporated a "relitigation bar" in 28 U.S.C. § 2254(d), *see Langley v. Prince*, 926 F.3d 145, 155 (5th Cir. 2019), which requires federal courts to accord a high degree of deference to state court decisions denying a prisoner's claims on the merits. Regarding § 2254(d), the United States Fifth Circuit Court of Appeals has explained:

> In enacting that provision, Congress imposed strict limitations on federal courts considering habeas applications from state prisoners. *See, e.g., Harrington v. Richter*, 562 U.S. 86, 102, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011); *Langley v. Prince*, 926 F.3d 145, 155 (5th Cir. 2019) (en banc), *cert. denied*, ___ U.S. ____, 140 S. Ct. 2676, 206 L.Ed.2d 826 (2020) (mem.); *see also Shinn v. Kayer*, ___ U.S. ___, 141 S. Ct. 517, 526, ___ L.Ed.2d ___ (2020) (per curiam) ("Under AEDPA, state courts play the leading role in assessing challenges to state sentences based on federal law."). "To overcome AEDPA's relitigation bar, a state prisoner must shoehorn his claim into one of its narrow exceptions." *Langley*, 926 F.3d at 155; *see* 28 U.S.C. § 2254(d)(1)-(2).

*Lucio v. Lumpkin*, 987 F.3d 451, 467 (5th Cir. 2021) (textual alteration removed).

The Fifth Circuit has observed that there are three such exceptions:

> The statute provides three exceptions to the general relitigation bar. A petitioner may obtain federal habeas relief on a claim that has been litigated in state court if the petitioner can show that the state court's decision was **contrary to** a federal law that was clearly established in Supreme Court holdings, that the decision was an **unreasonable application** of such law, or that the decision was based on an **unreasonable factual determination**.

*Williams v. Thaler*, 684 F.3d 597, 602 (5th Cir. 2012) (emphasis added).

The "contrary to" exception is found in 28 U.S.C. § 2254(d)(1). As to the exception, the Fifth Circuit has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

*Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, quotation marks, ellipses, and brackets omitted). The "contrary to" exception is narrow and "does not apply" "in most AEDPA cases." *Langley*, 926 F.3d at 155-56.

The "unreasonable application" exception, which is also found in 28 U.S.C. § 2254(d)(1), is more often litigated but "almost equally unforgiving." *Id.* at 156. Concerning that exception, the United States Supreme Court has explained: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." *White v. Woodall*, 572 U.S. 415, 426 (2014). But the Supreme Court expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

*Id.* (citations and quotation marks omitted).

Further, for that "unreasonable application" exception to apply, "a prisoner must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quoting *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017)); *see also Bell*, 535 U.S. at 694 ("[A]n unreasonable application is different from an incorrect one."). Indeed:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, **the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.**

*Langley*, 926 F.3d at 156 (boldface emphasis added; citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." *Id.* at 170.

The third exception, which is found in 28 U.S.C. § 2254(d)(2), concerns a state court's factual determinations. Under that exception, a federal court shall not grant relief for any claim adjudicated on the merits in State court proceedings "unless the adjudication of the claim … resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). *See also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As for these standards of review, the Fifth Circuit has emphatically reiterated:

"When Congress supplies a constitutionally valid rule of decision, federal courts *must* follow it." *Brown v. Davenport*, ___ U.S. ____, 142 S. Ct. 1510, 1520, 212 L.Ed.2d 463 (2022) (emphasis added). "In AEDPA, Congress announced such a rule." *Id.* Congress "designed [AEDPA] to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Richter*, 562 U.S. at 103, 131 S.Ct. 770. AEDPA's deference to state court decisions means *deference*, not *de novo*. Federal habeas review is "not a substitute for ordinary error correction through appeal." *Id.* at 102-03, 131 S.Ct. 770. "[I]f AEDPA makes winning habeas relief more difficult, it is because Congress adopted the law to do just that." *Davenport*, 142 S. Ct. at 1526.

*Russell v. Denmark*, 68 F.4th 252, 273 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 576 (2024).

In summary, "AEDPA prevents defendants – **and federal courts** – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010) (emphasis added). And the Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. *Woodall*, 572 U.S. at 417.

## IV. Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts here as follows:

In connection with count 1, in December 2011, officers with the Houma Police Department responded to Elysian Fields School in Houma, Louisiana, after the school principal called and reported that one of her students, C.G., was given a note at a bus stop by the defendant. C.G.

gave the note to her bus driver who turned it over to the school principal. The note stated:

> Hey,
>
>> Just wanted to say I think you have the most beautiful smile ever!!!
>
>> C.J.
>
> P.S.
> See You Soon! If you can use the pho

The note was torn after the letters "pho."

C.G. gave a statement wherein she stated that she first noticed the defendant drive by her bus stop on a Monday morning in a green vehicle with "Blaize's Fiberglass Boat Repair" written on the side window. According to the testimony presented at trial, the defendant's dog was riding in the backseat of his vehicle, and C.G. said, "hi puppy." In her statement, the student indicated that the defendant circled the block twice Monday and Tuesday. On Thursday, he passed eleven or twelve times and started saying, "hey, baby." He blew kisses to her on Thursday and Friday. On Friday, he pulled up, handed her a note, and said, "Read it." She admitted that she had to walk a few feet toward his vehicle to retrieve the note, but she stretched her arm out to get it because she was afraid he may grab her. She confirmed that the defendant was scaring her, and she was happy that he did not know where she lived. The defendant was thirty-one years old at the time, and C.G. was ten.

After viewing a photographic lineup, C.G. identified the defendant as the man who drove by, blew kisses at her, and gave her the note. The defendant was subsequently arrested on the stalking charge.

The facts in connection with count 2 were not fully developed because the defendant entered a plea of guilty. According to the bill of information and the *Boykin* colloquy, in November 2001, the defendant had sexual intercourse with a juvenile, resulting in the birth of A.V. (the victim in count 4).

When the victim in count 3, P.V., found out about the defendant's stalking charges, she contacted the police. According to P.V., the defendant and his girlfriend, Lindsey Sand, lived at her home when she was eleven years old, as Sand was her babysitter. One night, the defendant and Sand were sleeping in the bed with P.V. After Sand got out of bed the next morning, the defendant touched P.V.'s vagina. P.V. tried to move away from the defendant, but he pulled her back and

continued to touch her until she got out of the bed. After police spoke
with P.V., the defendant was arrested for sexual battery.

In connection with count 4, the victim, A.V., was interviewed by a
detective with the Houma Police Department, participated in a
Children's Advocacy Center interview, and attended counseling
sessions. A.V. disclosed that the defendant would watch pornographic
movies with her and try to touch her. He would also get out of bed while
everyone else was asleep and try to touch her. According to A.V., the
defendant touched her breasts and she had to perform oral sex on him.
The abuse took place between September 2010 and June 2011, when the
victim was eight years old.[33]

## V. Petitioner's Claims

### A. Excessive Sentence (Claim 1)

As his first claim, petitioner asserts: "The trial Judge violated petitioner's
Eighth (8th) Amendment of the United States Constitution by committing petitioner
to serve an unconstitutionally excessive sentence."[34] When petitioner asserted his
excessive sentence claim in the state post-conviction proceedings, the state district
court held:

In his first assignment of error, the defendant alleges that the sentences
imposed against him were excessive. He points out that he received a
life sentence along with three other consecutive sentences totaling
fifteen years. He notes that he had no prior felony convictions. His
argument in support of the allegation that the cumulative effect of his
sentences amounts to cruel and unusual punishment rests heavily on
his assertion that his convictions for aggravated rape and sexual battery
were based entirely on the inconsistent testimony of young victims
without any supporting physical evidence.

In response to the defendant's claim, the state asserts that Louisiana
Code of Criminal Procedure article 930.3 lists the exclusive grounds
upon which post conviction relief may be granted, and that list does not
include any claim of excessive sentence.

---

[33] Rec. Doc. 25, pp. 343-45 (footnotes omitted); *State v. Malbrough*, No. 2013 KA 2190,
2014 WL 3843879, at *1-2 (La. App. 1st Cir. Apr. 25, 2014) (footnotes omitted).
[34] Rec. Doc. 5, p. 3.

The court has reviewed the statutory provisions for imprisonment applicable to the crimes of which the defendant was convicted and which were in effect at the time those crimes were committed. The imprisonment penalty for stalking on December 16, 2011, a violation of La. R.S. 14:40.2, was up to three years, with or without hard labor. The imprisonment penalty for felony carnal knowledge of a juvenile in November, 2001, a violation of La. R.S. 14:80(A), was up to ten years, with or without hard labor. The imprisonment penalty for sexual battery in 2003, a violation of La. R.S. 14:43.1, was up to ten years, with or without hard labor, and without benefit of parole, probation, or suspension of sentence. Finally, the imprisonment penalty for aggravated rape between September, 2010, and June, 2011, a violation of La. R.S. 14:42(A)(4), was life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

Each of the sentences imposed against the defendant on August 26, 2013, was within the statutory limits. Contrary to the requirements of Louisiana Code of Criminal Procedure article 894.1(C), the presiding sentencing judge did not "state for the record the considerations taken into account and the factual basis therefor in imposing sentence." The court's entire statement in connection with the sentencing of the defendant for four felonies is reflected in only thirteen lines of the sentencing transcript and consists solely of the sentencing of the defendant. <u>Transcript</u>, August 26, 2013, p. 8, lines 7-20.

Each sentence the defendant received was less than the maximum sentence authorized by law, except the sentence for aggravated rape, which was the statutorily mandated sentence of life imprisonment. The sentencing transcript does not reflect any explanation as to why the trial judge required that the four sentences be served consecutively. Counsel for the defendant did not object to the sentences, but he did file a motion to reconsider the life sentence for aggravated rape on August 26, 2013. It appears from the record in this case that the motion was delivered to the judge by the Clerk of Court that same day, i.e., August 26, 2013, but that no hearing was held in connection with that motion and that the trial judge took no action with regard to the motion. On appeal, the court was not asked to review the possible excessiveness of any of the sentences.

This court's review of the record tends to establish that the appellate court nor appellate counsel was aware that the defendant filed a motion to reconsider sentence which was never acted upon by the presiding judge. It appears that a copy of that motion was not made part of the

record sent to the Louisiana First Circuit Court of Appeal or appellate counsel. The motion is still pending in this court.

A district court is not authorized to consider post conviction relief based on allegation of the excessiveness of a sentence because such consideration is not expressly authorized by Louisiana Code of Criminal Procedure article 930.3. As stated by the Louisiana Fourth Circuit Court of Appeal:

> "Article 930.3 lists all of the possible grounds for granting post-conviction relief....Importantly, those grounds do <u>not</u> include 'review of claims of excessiveness or <u>other sentencing error post-conviction</u>'....."

> <u>State v. Mead</u>, 165 So.3d 1044 (La. App. 4th Cir., 2015.)

Because there is no post-conviction review available on such a claim, the only opportunity for review is by direct appeal.

Under these circumstances, the court will grant the defendant post conviction relief in order to allow him to pursue his unresolved motion to reconsider sentence filed August 26, 2013. If the appellate court had been aware of the failure of this court to act on the motion, it certainly would have remanded the matter back to this court for a decision. Thereafter, the defendant would have been in a position to appeal any adverse resolution of the issue. <u>State v. Pernell</u>, 127 So.3d 18 (La. App. 4th Cir., 2013, writ denied, 135 So.3d 640 (La., 2014), appeal after remand, 151 So.3d 940 (2014). The defendant's due process right in this regard was abridged by the failure of the trial court to act on the motion to reconsider sentence and it is likely that he was prejudiced by such failure.[35]

On July 26, 2017, the district court then disposed of the motion to reconsider sentence by granting the limited relief of amending the sentence on Count 4 to run **concurrently** with the remaining sentences.[36]

---

[35] Rec. Doc. 25, pp. 619-21.
[36] Rec. Doc. 25, p. 776.

Petitioner thereafter filed a writ application with the Louisiana First Circuit Court of Appeal challenging the district court's denial of his post-conviction application.[37]  In that writ application, he acknowledged that the district court had granted relief for the sole purpose of considering his motion to reconsider sentence[38] and had then amended his sentence in the subsequent proceeding.[39] Yet he argued in the writ application that, despite that amendment, he "still asserts that these sentences are excessive."[40] The Louisiana First Circuit Court of Appeal denied that writ application without assigning reasons.[41]

Petitioner then filed with the Louisiana Supreme Court a related writ application[42] in which he reurged that argument.[43] The Louisiana Supreme Court denied relief: "[A]pplicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[44]

In its response in this federal proceeding, the state concedes that petitioner exhausted his remedies in the state courts;[45] therefore, the undersigned will address this claim on the merits.

---

[37] Rec. Doc. 25-1, pp. 96-129.
[38] Rec. Doc. 25-1, p. 105.
[39] Rec. Doc. 25-1, p. 108.
[40] Rec. Doc. 25-1, p. 108.
[41] Rec. Doc. 25, p. 805; *State v. Malbrough*, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).
[42] Rec. Doc. 25-1, pp. 581-612.
[43] Rec. Doc. 25-1, p. 596.
[44] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).
[45] Rec. Doc. 20, p. 10.

To begin, the Court notes that while petitioner references only the United States Constitution in the statement of this claim on his federal application,[46] he also references a provision of the Louisiana Constitution in his discussion of the claim in his accompanying memorandum.[47] However, to the extent, if any, that he is indeed claiming that his sentence is excessive or otherwise inappropriate under state law, that aspect of his claim is not cognizable in this federal proceeding. Federal habeas corpus relief is available to correct only violations of federal constitutional law, and, therefore, a federal habeas court does not sit to review alleged errors of state law. *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998). Accordingly, a claim that petitioner's sentence violates state law is not properly before this Court. *See, e.g., Nyberg v. Cain*, Civ. Action No. 15-98, 2015 WL 1540423, at *12 (E.D. La. Apr. 7, 2015); *Phillips v. Cain*, Civ. Action No. 13-5868, 2014 WL 4425751, at *10 (E.D. La. Sept. 8, 2014), *adopted*, 2014 WL 5080246 (E.D. La. Sept. 26, 2014); *Brunet v. Goodwin*, Civ. Action No. 12-1974, 2013 WL 623505, at *12 (E.D. La. Jan. 22, 2013), *adopted*, 2013 WL 619278 (E.D. La. Feb. 19, 2013).

On the other hand, petitioner's claim that his sentence is excessive under federal law is cognizable; however, as explained below, it is also meritless.

Petitioner's primary contention appears to be that his sentence is excessive because he "had no prior felony convictions."[48] But "simply because a penalty is harsh does not mean that it is unconstitutionally excessive." *Wade v. Cain*, Civ. Action No.

---

[46] Rec. Doc. 5, p. 3.
[47] Rec. Doc. 5-2, p. 15.
[48] Rec. Doc. 5-2, p. 16.

14-960, 2015 WL 3862774, at *15 (E.D. La. June 18, 2015); *accord Dick v. Cain*, Civ. Action No. 05-1467, 2008 WL 4544362, at *1 (E.D. La. Oct. 8, 2008). Moreover, the undersigned finds that petitioner's sentence does not cross that impermissible line for the following reasons.

Federal courts "afford wide discretion to [a] state trial court's sentencing decision, and challenges to that decision are not generally constitutionally cognizable, unless it is shown the sentence imposed is outside the statutory limits or unauthorized by law." *Dennis v. Poppel*, 222 F.3d 1245, 1258 (10th Cir. 2000) (citing *Haynes v. Butler*, 825 F.2d 921, 923-24 (5th Cir. 1987)). And, indeed, the federal constitutional prohibition against excessive sentences is a strictly limited one. Specifically, "the Eighth Amendment prohibits imposition of a sentence that is **grossly disproportionate** to the severity of the crime." *Rummel v. Estelle*, 445 U.S. 263, 271 (1980) (emphasis added). Therefore, if a state sentence is within statutory limits, a federal habeas court will not upset the terms of the sentence unless it is grossly disproportionate to the gravity of the offense. *Harmelin v. Michigan*, 501 U.S. 957 (1991); *Solem v. Helm*, 463 U.S. 277 (1983). And courts must always be mindful that successful proportionality challenges outside the context of capital punishment are "exceedingly rare" and constitutional violations are sustained only in "extreme" or "extraordinary" cases. *Ewing v. California*, 538 U.S. 11, 22 (2003) (quotation marks omitted); *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003) (quotation marks omitted).

The steps a court takes in assessing an excessive force claim are straightforward. In those cases where "a threshold comparison of the crime

16

committed to the sentence imposed leads to an inference of 'gross disproportionality,'" a court must consider (a) the sentences imposed on other criminals in the same jurisdiction and (b) the sentences imposed for commission of the same offense in other jurisdictions. *Smallwood v. Johnson*, 73 F.3d 1343, 1347 (5th Cir. 1996) (quoting *Harmelin*, 501 U.S. at 1005); *United States v. Gray*, 455 F. App'x 448, 449 (5th Cir. 2011); *United States v. Thomas*, 627 F.3d 146, 160 (5th Cir. 2010). **However, of import here: if a petitioner's sentence is <u>not</u> "grossly disproportionate" in the first instance, then the inquiry is finished.** *United States v. Gonzales*, 121 F.3d 928, 942 (5th Cir. 1997), *overruled in part on other grounds*, *United States v. O'Brien*, 560 U.S. 218, 234-35 (2010) (as recognized in *United States v. Johnson*, 398 F. App'x 964, 968 (5th Cir. 2010)).

Further, the United States Fifth Circuit Court of Appeals has held that *Rummel v. Estelle*, 445 U.S. 263 (1980), "establishes a **benchmark for disproportionate punishment** under the Eighth Amendment." *Gonzales*, 121 F.3d at 943 (emphasis added). In *Rummel*, the petitioner was convicted of obtaining $120.75 under false pretenses, and he had prior convictions for fraudulent use of a credit card and passing a forged check. He was then sentenced under a Texas recidivist statute to a term of life imprisonment, a sentence which the Supreme Court held was constitutional. In light of that holding, the Fifth Circuit observed:

> We acknowledge that the distinction between constitutional sentences and grossly disproportionate punishments is an inherently subjective judgment, defying bright lines and neutral principles of law. **Nevertheless, we can say with certainty that the life sentence approved in *Rummel* falls on the constitutional side of the line,**

17

> **thereby providing a litmus test for claims of disproportionate punishment in violation of the Eighth Amendment.**

*Gonzales*, 121 F.3d at 943 (emphasis added; footnote omitted).  Applying that litmus test here, the Court should reject petitioner's excessive sentence claim for the following reasons.

Petitioner primarily appears to focus on his sentence on the aggravated rape conviction. As noted, he was sentenced on that crime to a term of life imprisonment without benefit of parole, probation, or suspension of sentence. That sentence fell within the statutory limits for that crime; indeed, as observed by the state court, that penalty was statutorily mandated by Louisiana law. Further, given *Rummel*'s "litmus test" that a life sentence was not excessive for the relatively minor offenses involved in that case, it simply cannot be said that petitioner's life sentence in this case for the much graver offense of the aggravated rape of his minor child is grossly disproportionate under federal law. *See, e.g., Edwards v. Butler*, 882 F.2d 160, 167 (5th Cir. 1989) ("[L]ife without parole for aggravated rape under the Louisiana statute does not offend the eighth amendment proportionality analysis of *Solem v. Helm* …."); *York v. Vannoy*, Civ. Action No. 5:17-CV-223, 2019 WL 2617065, at *11 (W.D. La. May 1, 2019) ("Where life sentences have been upheld for multiple offenders of non-violent crimes, a life sentence for aggravated rape of a five-year-old child is not disproportionate or excessive."), *adopted*, 2019 WL 2621926 (W.D. La. June 25, 2019). And because petitioner's sentence was not grossly disproportionate, this Court's "inquiry is finished." *Gonzales*, 121 F.3d at 942.

Lastly, the undersigned notes that petitioner also expressly challenges his sentence for carnal knowledge of a juvenile. He argues:

> [P]etitioner believes that the seven (7) year sentence for carnal knowledge of a juvenile, a violation of La.R.S. 14:80(A), although within the statutory limits, was highly excessive if mitigating circumstances were taken into account. Such as the fact that petitioner was a first time offender when he plead [sic] guilty, the fact that he plead [sic] guilty which showed judicial economy by saving the state the cost of trial, the fact that he plead guilty admitting he did in fact commit said violation owning up to his misdeed, the fact that the statute allowed for probation or suspension of sentence, and finally that the highest limits of the sentence allowed by the statute should be reserved for the worst of the worst.[49]

That argument is unavailing for the following reasons.

First, petitioner's suggestion that he pled guilty out of concerns over judicial economy or the public purse is belied by the record, which clearly establishes that he pled guilty to the charge because the evidence of his guilt was overwhelming and because it afforded him a tactical advantage in his trial on his remaining charges. The transcript of the plea colloquy reflects the following exchange:

BY THE COURT:

> You – I think for the record, we need to have some explanation of why he is pleading guilty to this, and going to trial on the other ones, for possible Post Conviction Relief, or incompetent assistance of counsel claims later on down the road.

BY MR. THOMAS:

> We discussed it – this Carnal Knowledge case can be proven with D.N.A. evidence, and the child – there was a child born of this relationship. The child's birth certificate and the D.N.A. evidence, in my opinion, would be sufficient for a jury to convict him of this charge. And it was my advice to him that he would lose credibility with the jury by

---

[49] Rec. Doc. 5-2, p. 16.

pleading not guilty to this case, which is almost indisputable in my opinion.

BY THE COURT:

      Yes.

Q.     Do you understand that?

A.     Yes, sir, I plead guilty because I was guilty of that one.

Q.     And it may be of some strategic value to you, and your counsel, in this other trial. So, you heard your lawyer's advice and you agree to follow it; and enter this guilty plea, right?

A.     Yes, Your Honor.[50]

Second, petitioner's suggestion that his sentence fails to reflect his status as a first offender and the fact that he is not "the worst of the worst" is equally meritless. As the state court explained both at the time petitioner pled guilty and in the foregoing post-conviction ruling, petitioner faced a sentence of up to **ten** years. He was sentenced to only seven years, a term well below the statutory maximum.

Third, petitioner's argument downplays the seriousness of his crime. He committed a sex offense against a juvenile and a pregnancy resulted. Unquestionably, that offense was considerably graver than the offenses in *Rummel*, for which that petitioner received life imprisonment. Therefore, it simply cannot be said that petitioner's seven-year sentence for his undeniably more serious crime is grossly disproportionate under federal law. *See, e.g., Quezada v. Avoyelles Correctional Center*, Civ. Action No. 15-781, 2015 WL 5061230, at *11 (E.D. La. Aug. 17, 2015)

---

[50] Rec. Doc. 25, pp. 1007-08.

(finding that a nine-year sentence for carnal knowledge of a juvenile was not excessive).[51] So, once again, because the sentence is not grossly disproportionate, this Court's "inquiry is finished." *Gonzales*, 121 F.3d at 942.

For all of these reasons, petitioner's excessive sentence claim should be denied.

## B. Ineffective Assistance of Counsel (Claims 2 - 7)

Petitioner next claims that he received ineffective assistance of counsel both at trial and on appeal. The clearly established federal law governing such claims is *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the United States Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction … has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings,

---

[51] In *Quezada*, District Judge Ivan L.R. Lemelle adopted a Report and Recommendation of Magistrate Judge Sally Shushan, who observed:

> [P]etitioner's sentence fell within the range provided by law. Moreover, his crime, a sexual offense involving a minor, was particularly serious. *See, e.g., United States v. Lamere*, 337 Fed. App'x 669, 672 (9th Cir. 2009) ("This court has generally recognized the grave harm resulting from sexual crimes relating to children."). In light of those considerations, as well as the finding in *Rummel* that a *life* sentence was not excessive for the relatively minor offenses involved in that case, this Court cannot conclude that petitioner's nine-year sentence for the grave offense of carnal knowledge of a juvenile is grossly disproportionate under federal law. Because the sentence is not grossly disproportionate, this Court's "inquiry is finished." *Gonzales*, 121 F.3d at 942.

*Quezada*, 2015 WL 5061230, at *29.

21

it cannot be said that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 697.

When assessing whether counsel's performance was deficient, a court must always remember that "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington v. Richter*, 562 U.S. 86, 110 (2011). Therefore, "[t]o establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 104 (quotation marks omitted). Moreover, the Supreme Court has cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (citations and quotation marks omitted).

*Strickland*'s prejudice component is no less exacting. The Supreme Court has explained:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

*Richter*, 562 U.S. at 111-12 (citations and quotation marks omitted).

Further, because petitioner's ineffective assistance of counsel claims were denied on the merits in state court, the AEDPA's deferential standards of review apply to this Court's review. Therefore, to prevail on his claims in this federal proceeding, petitioner must show that the state court decision denying the claims on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Adekeye v. Davis*, 938 F.3d 678, 682 (5th Cir. 2019); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

Where the state court has correctly identified *Strickland* as the controlling federal law in its denial of the claim, the question on habeas review "is whether the state court's application of the *Strickland* standard was unreasonable." <u>Richter</u>, 562 U.S. at 101. The United States Supreme Court has cautioned:

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect*

23

> application of federal law. A state court must be granted a deference and
> latitude that are not in operation when the case involves review under
> the *Strickland* standard itself.

*Id.* (citation and quotation marks omitted). Therefore, "[f]ederal habeas courts must

guard against the danger of equating unreasonableness under *Strickland* with

unreasonableness under § 2254(d). When § 2254(d) applies, the question is not

whether counsel's actions were reasonable. The question is whether there is any

reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at

105 (emphasis added). As a result, in effect, the federal habeas court must "afford

**both** the state court **and** the defense attorney the benefit of the doubt." *Woods v.*

*Etherton*, 578 U.S. 113, 117 (2016) (emphasis added; quotation marks omitted).

Applying these stringently deferential standards of review, this Court finds

that, for the following reasons, the state court correctly and reasonably denied

petitioner's ineffective assistance claims on the merits.

## 1. Trial Counsel (Claims 2 - 5)

Before addressing petitioner's specific allegations of ineffective assistance of

trial counsel, the state district court correctly identified *Strickland* as the controlling

federal law, noting:

> Claims of ineffective assistance of counsel are reviewed under the two-
> part test of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80
> L.ED2d 674 (1984). In order to prevail, the defendant must show both
> that (1) counsel's performance was deficient and (2) he was prejudiced
> by the deficiency. With regard to the second element, i.e., prejudice, the
> defendant must show that any error was so serious as to deprive him of
> a fair trial or other proceeding. To carry this burden, the defendant must
> show that there is a reasonable probability that but for counsel's

deficient performance, the result of the proceeding would have been different.[52]

The district court then further noted:

The defendant has suggested that defense counsel's performance was deficient because he was not paid what he had been promised for his services and that he had a personal dislike of the defendant. There is absolutely no reference in the defendant's post conviction relief application that he suspected defense counsel did an inadequate job because he was frustrated over nonpayment of his legal fees prior to trial. However, at the post conviction hearing, a great deal of testimony offered by the defendant centered on the fact that Mr. Malbrough's family had not paid legal fees timely and, in fact, only paid a relatively small portion of the same. Mr. Malbrough suggests that this fact as well as Mr. Thomas' personal dislike of Mr. Malbrough affected defense counsel's performance.

The court is aware that after trial, Mr. Malbrough filed a complaint against Mr. Thomas with the Louisiana State Bar Association, and in response to the defendant's allegations, Mr. Thomas did state that he zealously represented Mr. Malbrough in spite of his "personal dislike" of him. The court believes that it is more probable than not that Mr. Thomas did not hold a high opinion of Mr. Malbrough and considered him an unsavory character. It is likely that the failure of the defendant and his family to pay Mr. Thomas' fees did not make Mr. Thomas' tasks any more pleasant. Regardless of these factors, the court is required to review Mr. Thomas actual performance in light the [sic] standards established by law.[53]

The district court then proceeded to address each of petitioner's specific ineffective assistance of counsel claims as follows.

## a. Failure or Refusal to Obtain Experts and Defense Witnesses for Trial (Claim 2)

---

[52] Rec. Doc. 25, pp. 621-22.
[53] Rec. Doc. 25, p. 622.

Petitioner claims that his trial counsel was ineffective "when he failed or refused to obtain experts and defense witnesses at trial."[54] In the state post-conviction proceedings, the state district court denied that claim, holding:

> With regard to his claim that trial counsel was ineffective for failing to obtain experts, the defendant alleges as follows:
>
>> "In the state's case against the petitioner, the state called two (2) supposedly expert witnesses that testified to their opinion only, there was no evidence substantiating their opinion. Petitioner's trial attorney failed to call independent expert witnesses so the possibility of disagreement among experts could not be relied upon. State's expert witness testimony of their opinion should not be the sole evidence that sends a man to prison for the rest of his life."
>
> The defendant also alleges that defense counsel failed:
>
>> "to properly cross-examine the state's experts and witnesses on the inconsistences of their testimony and earlier statements to detectives, and…failed to present an adversarial challenge to the state's experts['] testimony."
>>
>> ***
>>
>> "to retain independent experts to assist in the preparation of cross examination, resulted in undue influence and substantial prejudice to the weight given to the evidence at trial…."
>
> In sum, the defendant claims defense counsel was ineffective because he did not (1) present expert testimony on the defendant's behalf, (2) properly cross-examine the state's expert witnesses or otherwise challenge their testimony, and (3) retain experts to prepare for proper cross-examination of the state's expert witnesses.

---

[54] Rec. Doc. 5, p. 4. Despite this narrow summation by petitioner of this claim, his claim in fact encompasses a multitude of other alleged failings of counsel. The state courts addressed the full scope of this claim as it was asserted by petitioner in his state post-conviction application, and this Court will likewise discuss all aspects of the claim as reurged by him in his federal application.

The court notes that the state called two witnesses who qualified as expert witnesses to testify for the state. The first was Anne Troy, who was qualified as an expert by the court as a forensic nurse practitioner specializing in child abuse, over the objection of defense counsel. The second state expert who testified was Dana Davis. She was accepted by the court as an expert in "Clinical Psycho-Therapy, in Social Work Practice," again over the objection of the defendant.

Ms. Troy explained to the jury that she first saw A.V. at the Children's Hospital Audrey Hepburn Clinic in New Orleans on January 9, 2013. The child repeated to her a single allegation of an act of aggravated rape she previously made to law enforcement authorities, almost a year before. Ms. Troy saw her again on January 19, 2013, but the child never indicated anything more than she had performed oral sex on her father once. According to Ms. Troy, it was not surprising that the child's physical exams were entirely normal. She also testified that delayed reporting and continued affection for the perpetrator by the child victim in child sexual abuse cases is not unusual.

Dana Davis testified that she first saw A.V. on January 30, 2012, following her first interview by Dawn Buquet at the Children's Advocacy Center. She had last seen her on June 11, 2013, the day before both of them testified in court in this case. She testified that gradually, over many weeks, A.V. made numerous disclosures of sexually related incidents between her and her father, Mr. Malbrough, including the act for which he was accused of aggravated rape. She opined that this was not unusual in child abuse sex cases. She also reaffirmed the testimony of Ms. Troy to the effect that continued affection for the perpetrator of child sexual abuse by the victim child is not unusual.

Neither expert called by the state offered any opinion as to the veracity of A.V. with regard to the specific allegation of aggravated rape made by her against the defendant.

Mr. Malbrough faults defense counsel for not furnishing to the jury the expert testimony on his behalf to counter the expert testimony of the state. As explained above, the experts for the state established that it is not unusual (1) for the physical examination of a child sexual abuse victim to be normal, (2) for the child sexual abuse victim to delay reporting the criminal act, (3) for the child sexual abuse victim to make a gradual disclosure of offending conduct, and (4) for the child sexual abuse victim to maintain affection for an offender.

At the post conviction relief hearing in this matter, Mr. Thomas testified that he had discussed with his sister, a psychologist, the possibility of obtaining a sexual assault risk analysis of Mr. Malbrough to offer as evidence at trial. Based on his discussions with her, it [sic] did not think it would have been helpful. Mr. Malbrough confirmed that Mr. Thomas did discuss the possibility of such an analysis with him.

The defendant has not furnished to this court any evidence of an expert nature to contradict the matters established by the state's experts. It may very well be because no such reliable expert evidence exists. These concepts affirmed by the state's experts' testimony have been well-established in many cases of this sort, and the court believes that the jury would have found contrary expert testimony highly suspect. Even if the court were to assume counsel's performance was deficient for failure to find and offer such contrary expert opinions, the court is not convinced that the defendant was prejudiced thereby. Any such error was not so serious as to deprive Mr. Malbrough of a fair trial. The court does not believe that but for such error, there is a reasonable probability that the result of the trial would have been different.

The defendant also alleges that defense counsel did not adequately cross-examine the state's experts and did not consult with experts of his own in order to be better prepared to cross-examine them. The defendant has not pointed to any particular line of questioning in which defense counsel should have engaged the witnesses, and the defendant has not pointed out any specific deficiencies of defense counsel with regard thereto. The court has thoroughly reviewed the cross-examination of these witnesses by Mr. Thomas. <u>Trial Transcript</u>, June 12, 2013, pp. 90-93; pp. 108-111. The court is of the opinion that the cross-examination of each witness was adequate. The court cannot identify any deficiency in defense counsel's questioning of the witnesses that might be said to have operated to the defendant's prejudice such that he was denied a fair trial.

The defendant also complains that trial counsel failed to properly cross-examine, or impeach the testimony of other state witnesses to show the inconsistencies between their testimony in court and previous statements they made to detectives. The only state witnesses to whom this allegation might apply were the three alleged victims, C.G., P.V., and A.V. The pertinent parts of the trial testimony of all three witnesses are set forth hereinbelow in regard to Assignment of Error No. 10. Defense counsel cross-examined C.G. and P.V., but did not cross-examine A.V. The defendant alleges that he specifically directed counsel to cross-examine his daughter, but he refused.

The court has examined the cross-examination by defense counsel of both C.G. (<u>Trial Transcript</u>, June 11, 2013, pp. 166-67) and P.V. (<u>Trial Transcript</u>, June 12, 2013, pp. 12-13). The defendant has not directed the court's attention to any alleged inconsistent statements made by either witness prior to their testimony in court that was not called to the attention of the witness in court.

The court has not been made privy by way of the defendant's post conviction relief application to exactly what Mr. Malbrough wanted defense counsel to ask his daughter, A.V., on cross-examination. At the post conviction relief hearing in this matter, however, he indicated that counsel should at least have asked her if the allegations she made by way of her videotape statement were true. Obviously, defense counsel's decision not to cross-exam [sic] A.V. was a strategic decision which should not be second-guessed in hindsight. There was a very good reason not to ask A.V. that question. She had already told the prosecutor it was true, so it was not likely that the answer would have been different when asked by defense counsel, too. And if she responded "yes," the defendant would have suffered even greater damage from her testimony. Without any other evidence to contradict her statements or impeach her testimony, the jury might have perceived any attack on her by defense counsel as offensive. It seems defense counsel took the wisest course. It appears, even with the benefit of hindsight, that there was simply nothing to gain by cross-examining A.V.

....

Mr. Malbrough also suggests that defense counsel's trial performance was inadequate because he failed to cross-examine the state's witness, Detective Travis Theriot, about a previous disagreement he had with the defendant and Detective Theriot's resulting "personal vendetta" against him. The defendant has not offered this court any evidence of any such disagreement or vendetta, and the court has been unable to glean any suggestion of the same from the trial testimony of Detective Theriot. For that reason, the court cannot say that Mr. Thomas' cross-examination of the witness was below par.

The defendant claims that trial preparation by Mr. Thomas regarding defense witnesses was ineffective and that he was denied a fair trial as a result thereof. He specifically alleges that defense counsel:

(1) did not review with him or any other defense witnesses, the testimony of each before taking the stand;

(2) failed to call several defense witnesses, and subpoenaed two defense witnesses at the last minute.

According to Mr. Malbrough, his attorney did not review his potential testimony with him prior to calling him to testify on the third day of trial. He did acknowledge that Mr. Thomas met with him "only a few times a year" at the jail since his arrest eighteen months before trial. Mr. Thomas testified that he met with the defendant seven to nine times at the jail, and accompanied him to the district attorney's office to view videotaped evidence. Mr. Thomas specifically testified that he did go over with Mr. Malbrough, potential questions he could expect from the prosecutor. The court has reviewed the direct testimony given by Mr. Malbrough under the guidance of questioning by defense counsel. <u>Trial Transcript</u>, June 12, 2013, pp. 121136. The only deficiency the court noted was the failure of counsel to ask the defendant directly if he had committed sexual battery on the alleged victim, P.V. However, the defendant had an opportunity to deny the accusation when he was cross-examined by the prosecutor.

The defendant also alleges that defense counsel did not go over the testimony of defense witnesses before they testified. Mr. Thomas denied the accusation and declared that he did, in fact, do so. The only defense witnesses other than the defendant, were the defendant's younger sister, Miranda Malbrough, and the defendant's friend, Keith Crochet. Miranda Malbrough testified at the post conviction relief hearing in this matter and said that Mr. Thomas never went over her anticipated testimony with her. The court considers the direct testimony elicited from Miranda Malbrough by Mr. Thomas to have been quite potent and supportive of the defendant's position that the charges against him were instigated and promoted by his ex-girlfriend, Lindsay [sic] Sand, in order to keep the defendant in jail so she could raise their son alone. The transcript of her testimony seems to indicate that she was also effective in conveying to the jury that her brother was not the kind of person who would do the things of which he was accused. <u>Trial Transcript</u>, June 12, 2013, pp. 113-117.

Keith Crochet, Jr., also testified for the defense and was questioned on direct examination by Mr. Thomas. He also confirmed that he never had any reason to suspect that his friend, Mr. Malbrough, had engaged in any inappropriate behavior with children, including his daughter. <u>Trial Transcript</u>, June 12, 2013, pp. 118-120. The questions asked of him by defense counsel seemed to indicate familiarity with him, his family, and his relationship with the defendant. The court would have difficulty

believing that Mr. Thomas did not review his testimony with him before he testified.

All things considered, the court is not convinced that Mr. Thomas did not review with all the defense witnesses, their testimony beforehand, despite the allegations of Mr. Malbrough.

The defendant also alleges that his trial counsel failed to call several defense witnesses, and subpoenaed two defense witnesses at the last minute, Dustin Boudreaux and Keith Crochet, Jr., one of whom, Mr. Boudreaux was unable to be served. As indicated above, Mr. Crochet did testify for the defendant at trial.

In particular, the defendant alleges counsel should have presented testimony from Richard Harper, Dustin Boudreaux, Paul Lapeyrouse, Jr., Cheryl Malbrough, and Thomas Malbrough. Three of these witnesses, Richard Harper and Mr. and Mrs. Malbrough, testified at the post conviction relief hearing. Mr. Lapeyrouse and Dustin Boudreaux did not. The court has not been offered an explanation by the defendant as to what testimony Dustin Lapeyrouse would have offered at trial.

The testimony of Richard Harper, who live [sic] off and on with the defendant years ago, would have been offered to counter the state's evidence that the defendant had a lustful disposition toward children. This testimony would have bolstered the testimony of the defendant, Mr. Crochet, and Miranda Malbrough.

The testimony of Paul Lapeyrouse, Jr., a friend of the defendant, would have been offered to explain a recorded jail conversation he had with the defendant offered as part of state exhibit S-7, call number 8. That telephone call purportedly reflected an attempt by the defendant to frame his ex-girlfriend, Lindsey Sand, on a drug charge with the help of Mr. Lapeyrouse because she was behind the prosecution of the defendant. Mr. Thomas testified that he spoke to Mr. Lapeyrouse prior to trial and he decided that his testimony would cause the defendant "more damage than good."

The testimony of the defendant's parents, Thomas Malbrough and Cheryl Malbrough, would have been offered to again bolster the testimony of the defendant, Mr. Crochet, and Miranda Malbrough regarding the defendant's lack of lustful disposition toward children, and the enmity between the defendant and Lindsey Sand. Mr. Thomas decided not to call them as witnesses for the following reason.

At trial, there was received into evidence as part of state exhibit S-7, another recorded telephone conversation at the jail identified as call number 4. This conversation between the defendant and his mother, contained statements by the defendant's mother clearly indicating that the defendant's father had gone to the defendant's home immediately after his arrest to remove the hard drives from his son's computer because he believed they contained evidence of child pornography that might be discovered by the police. Although Mr. Malbrough denied this accusation at the post conviction hearing, Ms. Malbrough surely would have had to explain her recorded statements indicating the contrary.

Based on the analysis of the potential testimony of the witnesses who were not called to testify for the defendant, the court cannot fault Mr. Thomas with his decision not to call the witnesses. These were strategic decisions which, in hindsight, the court cannot say were unreasonable.

The defendant and several other witnesses at the post conviction relief hearing expressed extreme disappointment with the closing argument given by Mr. Thomas on the defendant's behalf. The defendant alleges that the argument was indicative of the defendant's lack adequate preparation and contributed to an unfair trial.

The court has reviewed the transcript of defense counsel's closing argument in this case. Trial Transcript, June 13, 2013, pp. 17-30. It is apparent that counsel emphasized, among other things, the role of Lindsey Sand in her zeal to keep the defendant in jail, her influence over some of his accusers, and her motives. Counsel raised questions about the alleged facts in the case, reminded the jurors of the concept of reasonable doubt, and the reasonableness of expert opinions. He appealed to them not to be influenced by their emotions, and he reminded them of the severe consequences for the defendant if found guilty.

A closing argument on behalf of a defendant is just that, an argument. It is not evidence. It is designed to cause jurors to hesitate and carefully consider the points which the attorney makes on behalf of the defendant. Not all closing arguments by attorneys are as artful and precise as those made by others, and it is difficult to assess the effectiveness of a closing argument in hindsight.

After a full review of defense counsel's closing argument in this case, the court cannot say that defense counsel's performance was less than it

should have been, or that the closing argument was so woefully inadequate that it contributed to an unfair trial.[55]

The Louisiana First Circuit Court of Appeal thereafter denied petitioner's related writ application without assigning reasons.[56] The Louisiana Supreme Court then likewise denied relief, stating: "Applicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[57]

The state court's application of *Strickland* in denying petitioner's claim was reasonable for the following reasons.

As noted, petitioner contends that counsel was ineffective in his handling of both expert witnesses and lay witnesses. The undersigned will separately address the two types of witnesses.

With respect to experts, petitioner argues that counsel was ineffective for failing to (1) secure expert witnesses to testify for the defense at trial, (2) adequately prepare for his cross-examination of the prosecution's experts by consulting with independent experts, and (3) adequately cross-examine the state's experts at trial.

---

[55] Rec. Doc. 25, pp. 622-31.  The state district court's discussion of this claim also addressed allegations that counsel was ineffective for failing to participate in a hearing on a motion to amend the indictment and for failing to furnish petitioner with a "discovery packet" prior to trial. Because petitioner does not reurge those arguments in his discussion of this claim in his federal application, those portions of the state court's opinion are not relevant in this federal proceeding and so have been omitted herein.

[56] Rec. Doc. 25, p. 805; *State v. Malbrough*, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).

[57] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).

Regarding claims concerning the failure to call witnesses, including expert witnesses, at trial, the United States Fifth Circuit Court of Appeals has held:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. For this reason, **we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.** This requirement applies to both uncalled lay and expert witnesses.

*Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted; emphasis added); *accord Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."). The Fifth Circuit has further cautioned that "the seemingly technical requirements of affirmatively showing availability and willingness to testify '[are] not a matter of formalism.'" *Hooks v. Thaler*, 394 F. App'x 79, 83 (5th Cir. 2010) (quoting *Woodfox*, 609 F.3d at 808).

Here, petitioner presented no evidence, such an as affidavit from any expert, showing that he or she was available and would have testified in a manner beneficial to the defense. Therefore, petitioner obviously failed to meet his burden of proof with respect to this claim. *See, e.g., United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir.

34

1983) (courts view "with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant"); *Buniff v. Cain*, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); *Anthony v. Cain*, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); *Combs v. United States*, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); *Harris v. Director, TDCJ-CID*, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

Petitioner's contention that his counsel was ineffective for failing to adequately prepare for his cross-examination of the prosecution's experts by consulting with independent experts fares no better. To prevail on such a claim of inadequate preparation, a petitioner must "demonstrate that the alleged inadequate preparation prejudiced him." *United States v. Vilarchao*, No. 95-50284, 1996 WL 255261, at *1 (5th Cir. Apr. 30, 1996). Petitioner has not met that burden. Just as he failed to identify an expert who could have testified in a manner beneficial to the defense, he has similarly failed to identify an expert who could have provided any information or

advice to counsel which would have assisted him in cross-examining the state's experts more effectively. As a result of that failure, petitioner has not shown that consultation with such an expert would have aided in the cross-examination and, therefore, necessarily, he has not established that any prejudice whatsoever resulted from his failure to engage in such a consultation.

Petitioner's contention that counsel was ineffective in his cross-examination of the state's two expert witnesses is likewise meritless. It is clear that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment." *Ford v. Cockrell*, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), *aff'd*, 135 F. App'x 769 (5th Cir. 2005); *accord Lewis v. Cain*, Civ. Action No. 09-2848, 2009 WL 3367055, at *8 (E.D. La. Oct. 16, 2009), *aff'd*, 444 F. App'x 835 (5th Cir. 2011); *Williams v. Cain*, Civ. Action Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *11 (E.D. La. May 7, 2009), *aff'd*, 359 F. App'x 462 (5th Cir. 2009); *Packnett v. Cain*, Civ. Action No. 06-5973, 2008 WL 148486, at *11 (E.D. La. Jan. 10, 2008); *Parker v. Cain*, 445 F. Supp. 2d 685, 710 (E.D. La. 2006). The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such tactical matters through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. *Strickland*, 466 U.S. at 689. Moreover, it must be remembered that "[t]he Constitution demands reasonable competence, not perfect advocacy." *Castillo v. Stephens*, 640 F. App'x 283, 292 (5th Cir. 2016). And, of

import here, it is likewise necessary to remember that when a petitioner is asserting a claim of inadequate cross-examination, he bears the burden to prove to show "how a different cross-examination would have created a reasonable probability of a different outcome." *Id.* Such a showing has not been made in this case.

On the contrary, as noted, the state district court judge reviewed the cross-examination of the state's two expert witnesses and found that the cross-examination was adequate. The undersigned has likewise reviewed those portions of the trial transcript[58] and reached the same conclusion. Specifically, the undersigned has not identified any deficiency in defense counsel's questioning of the witnesses that might be said to have operated to petitioner's prejudice such that he was denied a fair trial. In summary, there is simply no reasonable probability of a different outcome if only defense counsel had handled the cross-examination of the experts differently.

Petitioner next voices similar complaints regarding the way counsel handled the lay witnesses in this case. Specifically, petitioner argues that counsel was ineffective for failing to (1) adequately cross-examine the state's lay witnesses at trial, (2) adequately prepare the defense witnesses called to testify at trial, and (3) call additional defense witnesses for trial. For the following reasons, those arguments are likewise unavailing.

Concerning defense counsel's cross-examination of the state's lay witnesses, the transcript reflects that there were nine such witnesses: Detective Travis Theriot; C.G.; Malika McKinley; Melanie Robert Wallis; P.V.; Lindsey Sand; Nicole Voisin;

---

[58] Rec. Doc. 25, pp. 1383-86 (Troy) and 1401-04 (Davis).

A.V.; and Deanne Fontenot. Defense counsel cross-examined each of those witnesses,[59] except for Wallis and A.V.[60]

For those witnesses who were cross-examined, petitioner has not met his burden to prove that counsel's assistance was ineffective. As already noted, the manner in which counsel conducts cross-examination is a matter of strategy, and, as such, the law presumes that counsel's assistance was adequate under the circumstances. Therefore, petitioner must rebut that presumption, and he cannot do so in a conclusory fashion. Moreover, as already noted, he must also show "how a different cross-examination would have created a reasonable probability of a different outcome." *Castillo v. Stephens*, 640 F. App'x 283, 292 (5th Cir. 2016). Here, petitioner has not done so. Further, in any event, the undersigned has in fact reviewed counsel's cross-examination of each of the lay witnesses and finds that it fell within the range of reasonable assistance.

With respect to counsel's cross-examination of the victims, the undersigned additionally notes that petitioner's suggestion of ineffectiveness is particularly misplaced because, as the state court correctly noted, vigorous cross-examination of the victims of sex crimes can backfire and be viewed as offensive by the jurors. Clearly, defense counsel was particularly concerned about that danger in this case, given that he testified as follows at the post-conviction hearing:

> I know it is a very tricky thing to cross-examine the victim, especially someone who has been the victim of a sexual battery or rape as a child.

---

[59] Rec. Doc. 25, pp. 1264-72 (Theriot), 1281-82 (C.G.), 1286-87 (McKinley), 1305-06 (P.V.), 1321-28 (Sand), 1341-43 (Voisin), and 1359 (Fontenot).
[60] *See* Rec. Doc. 25, pp. 1289 (Wallis) and 1355 (A.V.)

> You risk – you risk turning the jury against you so much that – this was
> another issue that Mr. Malbrough and I had during the trial, he wanted
> me to go after the child witnesses, particularly the little girl that was
> the victim of the stalking case. And I tried to tell him that if you beat up
> on a child on the witness stand, even if you find some inconsistencies in
> her story, very often the jury will turn against you for that and it will do
> more damage to your case than good, so there was a strategic decision
> not to beat up on the children who were witnesses.[61]

Under the circumstances of this case, it simply cannot be said that counsel's strategic choice on this matter was unreasonable.

Likewise, it was reasonable for counsel to opt to forgo cross-examination of Wallis and A.V. As for Wallis, her testimony was brief and uncontroversial;[62] therefore, no cross-examination was necessary. As for A.V., she was a child victim, and the reasonableness of forgoing examination of such a witness has already been discussed.

As to petitioner's allegation that counsel failed to adequately prepare the defense witnesses called to testify at trial, defense counsel disputed that allegation in his testimony at the post-conviction hearing:

> Q.    Before trial, before these defense witnesses testified did you talk
> to them about their testimony, did you ask them what information they
> had to offer?
>
> A.    Sure, I talked to each of them before they testified.[63]

---

[61] Rec. Doc. 25-1, pp. 219-20.
[62] Rec. Doc. 25, pp. 1288-89.
[63] Rec. Doc. 25-1, p. 217.

He likewise testified at the post-conviction hearing that, although he did not want petitioner to testify, he nevertheless prepared petitioner to do so after he insisted on taking the stand in his own defense:

> Q.   Was it Mr. Malbrough's decision to testify?
>
> A.   Absolutely. I would not have – I would not have elected to put him on the witness stand. He was absolutely convinced that he was so charming that the jury would love him. He told me repeatedly, that he was going to get up there and win this case and he just needed me to stay out of the way.
>
> Q.   And did y'all review his testimony – the questions that you would ask him before he testified?
>
> A.   Yes. And I told him the questions I thought it was likely that Mr. Barnes would ask him.[64]

Based on that testimony and the record, the state district judge, as noted in his opinion, was unconvinced by petitioner's allegation that defense counsel failed to prepare the defense witnesses. The undersigned agrees.

Moreover, regardless, the United States Fifth Circuit Court of Appeals has generally found such claims unavailing. *See, e.g., Coble v. Quarterman*, 496 F.3d 430, 435-36 (5th Cir. 2007) ("Coble claims trial counsel did not adequately … prepare the witnesses who testified. … [E]ven assuming counsel failed to fully prepare these witnesses, Coble only argues that these witnesses would have been 'more effective' if they had been better prepared, which does not come close to suggesting that 'but for counsel's errors, the result of the proceeding would have been different.'"). That is certainly true here for the following reasons.

---

[64] Rec. Doc. 25-1, pp. 244-45.

Even if the Court assumes for the purposes of this decision that counsel failed to prepare the only two defense witnesses other than petitioner, namely, Miranda Malbrough and Keith Crochet, Jr., petitioner has not established that preparation of those witnesses would have led to a different result. On the contrary, regardless of the level of preparation, the state district court judge observed that Miranda Malbrough testified effectively, and the undersigned agrees with that assessment. She testified that petitioner was an involved and caring father who was "awesome with his kids," while Lindsey Sand was a vengeful accuser who "said she would stop at nothing to make sure she keeps [petitioner] in jail" so that she could raise their son alone.[65] It is unclear what more the witness could have said. As for Crochet, his testimony was limited, but that was understandable given that he had little to offer. He simply stated that, at Sand's urging, he questioned his children, and that they denied any improper conduct by petitioner toward them or his own children. Crochet further stated that he trusted petitioner with his kids.[66] Again, it is unclear what else he could have offered in his testimony.

Lastly, petitioner faults counsel for failing to call the following additional witnesses at trial: Richard Harper; Cheryl and Thomas Malbrough; Paul Lapeyrouse, Jr.; and Dustin Boudreaux.

As for defense counsel's failure to call Harper, it is difficult to say that petitioner was prejudiced by that failure. Harper would have testified that petitioner

---

[65] Rec. Doc. 25, pp. 1407-10.
[66] Rec. Doc. 25, pp. 1411-13.

lacked a lustful disposition toward children. However, given that Miranda Malbrough and Keith Crochet, Jr., testified in that same vein, Harper's testimony on that point would have been cumulative. "Counsel's decision not to present cumulative testimony does not constitute ineffective assistance." *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007); *accord Gardner v. Davis*, 779 F. App'x 187, 193 (5th Cir. 2019); *United States v. Harris*, 408 F.3d 186, 191 (5th Cir. 2005) ("This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel.").

Defense counsel's failure to call Cheryl and Thomas Malbrough, petitioner's parents, was likewise reasonable. As an initial matter, their proposed testimony would likewise have been cumulative of the testimony of other witnesses. Further, in any event, testimony of such close relatives is of questionable value because it is often viewed with suspicion. *See, e.g., Ball v. United States*, 271 F. App'x 880, 884 (11th Cir. 2008) (Petitioner's wife, brothers, and cousin "were all close family members with a strong motive to fabricate an alibi defense for him. As such, their testimony would not have been particularly compelling and would have been subjected to vigorous impeachment."); *Lewis v. Cain*, Civ. Action No. 09-2848, 2009 WL 3367055, at *11 (E.D. La. Oct. 16, 2009) (noting that petitioner's "grandmother's testimony would have been of limited value because her close familial relationship to the petitioner would have made her testimony inherently suspect"), *aff'd*, 444 F. App'x 835 (5th Cir. 2011); *Talley v. Cain*, Civ. Action No. 08-3542, 2009 WL 916331, at * 11 (E.D. La. Apr. 6, 2009) (noting that alibi testimony from the petitioner's mother would have been

inherently suspect); *United States ex rel. Emerson v. Gramley*, 902 F. Supp. 143, 147 (N.D. Ill. 1995) (noting that petitioner's mother was an "interested witness" and, therefore, "would not have provided persuasive evidence of an alibi"), *aff'd*, 91 F.3d 898 (7th Cir. 1996).

Further, any testimony petitioner's parents might have offered concerning his supposed lack of a lustful disposition toward children would have rightly been viewed as uncredible by the jury given the fact that, in one of the jail telephone calls introduced at trial,[67] petitioner's mother had said that his father had gone to petitioner's home to remove the hard drives from petitioner's computer based on a belief that it would contain child pornography. The father's action also posed an additional problem, because as defense counsel explained at the post-conviction hearing:

> Mr. Malbrough's father I thought would have damaged us because he had gone to Mr. Malbrough's house and removed some – the hard drives from Mr. Malbrough's computer, which I was also concerned that he could be charged with obstruction of justice if we called him. He was available as a witness, wanted to testify, but after reviewing it I thought he would damage our case because there was an allegation that Mr. Malbrough had taken photos of his young daughter while she was sleeping, of her vagina and that he had these on his computer and he had been confronted by his girlfriend, Lindsey, about them. And after that the police had come to his house and asked for the computers and he had denied them entry and then he had gotten his father to go to the house and remove the hard drives from the computer, so by the time the police seized them the hard drives containing the child pornography were gone. … [T]hey wanted the father to testify as a character witness about how great he was with the kids, but then I realized all of that had taken place I thought that he could potentially incriminate himself for

---

[67] The jail telephone calls introduced at trial are discussed in more detail *infra*.

obstruction of justice and he could also further damage Mr. Malbrough in the eyes of the jury.[68]

As for defense counsel's failure to call Lapeyrouse, counsel explained in the post-conviction hearing that the decision was a strategic one:

> Q.    But back to Mr. Lapeyrouse, isn't it correct that Mr. Malbrough had asked Mr. Lapeyrouse to do an illegal thing?
>
> A.    Yes, they were trying to get Lindsey Sand arrested for a drug charge by planting drugs on her. He specified in the phone call that he wanted it done while the children were present because he wanted it to be a felony.
>
> Q.    So if you would have brought Mr. Lapeyrouse it would have brought that fact to the – attention to jury a second time.
>
> A.    Yes.
>
> Q.    And did you believe that was in his best interest?
>
> A.    No, I thought it would emphasize one of the more negative aspects of the case.[69]

As for defense counsel's failure to call Boudreaux, petitioner has not shown that Boudreaux was willing and available to testify – or even identified the nature of Boudreaux's proposed testimony. That alone dooms his claim as to Boudreaux, because, again, this Court cannot merely assume that Boudreaux would have testified and that his testimony would be beneficial.

Lastly, to the extent that petitioner is challenging the effectiveness of counsel's closing argument, that aspect of his claim likewise has no merit. Regarding such claims, the United States Fifth Circuit Court of Appeals has explained:

---

[68] Rec. Doc. 25-1, pp. 242-43.
[69] Rec. Doc. 25-1, pp. 243-44.

44

> The Supreme Court has emphasized that counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should sharpen and clarify the issues for resolution by the trier of fact, but which issues to sharpen and how best to clarify them are questions with many reasonable answers. At times, it may make sense to forgo closing argument altogether. Judicial review of a defense attorney's summation is therefore highly deferential – and doubly deferential when it is conducted through the lens of federal habeas.

*Clark v. Thaler*, 673 F.3d 410, 427 (5th Cir. 2012) (footnotes, quotation marks, and ellipsis omitted).

Here, as noted, the state district court reviewed defense counsel's closing argument and found that it was constitutionally adequate. The undersigned has likewise reviewed the closing argument[70] and reached the same conclusion for the same reasons noted by the state court. Further, and importantly, petitioner's suggestion that counsel's argument was inadequate is wholly conclusory; he offers no particulars whatsoever as to what points were made in error or omitted in error. Such conclusory allegations without supporting examples clearly will not suffice to overcome the deference which must be afforded both to counsel and to the state court's determination of adequacy.

In summary, petitioner has failed to meet his burden to prove that the state court unreasonably applied *Strickland* in its denial of any aspect of this multifaceted claim. Therefore, the AEDPA's deferential standards of review require that the claim likewise be denied in this federal proceeding.

---

[70] Rec. Doc. 25, pp. 1477-90.

**b. Failure or Refusal to Present Alibi Defense (Claim 3)**

Asserting that he had "an alibi for all of 2003,"[71] petitioner claims that his trial counsel was ineffective "when he failed or refused to present petitioner's claim of an alibi for count (3), sexual battery."[72] In the state post-conviction proceedings, the state district court denied that claim, holding:

> The defendant's third assignment of error challenges the effectiveness of his trial counsel for failing to present evidence of the defendant's alibi with regard to the charge of sexual battery. The defendant does not, in his post conviction relief application, describe or otherwise elaborate upon the alleged alibi evidence, even though he mentions this claim several times throughout his post conviction relief application.
>
> As explained in more detail hereinbelow with regard to Assignment of Error No. 10, the defendant has charged with sexual batter [sic] of P.V. "on or about 2003" based on a report she made to the police in 2012, after the defendant was arrested for the stalking charge. Before trial, in her statement to the police, P.V. claimed that the sexual battery had occurred in 2003 while Mr. Malbrough and his girlfriend, Lindsey Sand, were living in her home with her mother. At trial, and apparently for the first time, P.V. claimed that the sexual battery occurred in 2004, not 2003, while Mr. Malbrough and his girlfriend were living in her home.
>
> Mr. Malbrough was prepared to offer evidence at his trial that he did not live in P.V.'s home at any time in 2003. He claims that he lived in the community of Bourg during that year, not anywhere near P.V., and that he did not have any contact with her in 2003. He claims he had contact with her only for a couple of months in 2004, an apparent reference to the time that he and his girlfriend did live in P.V.'s home. He was prepared to offer the testimony of his father and mother as well as a friend, Keith Crochet, Jr., to confirm the fact that he did not live in P.V.'s home at all in 2003. He complains that defense counsel did not call any witnesses on his behalf to confirm that he did live in Bourg in 2003 and did not live in P.V.'s home during that time. Mr. Malbrough's parents did not testify at his trial, but Keith Crochet, Jr., did. Mr. Crochet was not questioned at all about any alibi Mr. Malbrough might have had to the sexual battery charge. <u>Trial Transcript</u>, June 12, 2013,

---

[71] Rec. Doc. 5-2, p. 28.
[72] Rec. Doc. 5, p. 5.

pp. 118-121. Defense counsel did not question Mr. Malbrough at all about the sexual battery charge when he called him to testify in his own defense on the third day of trial, June 12, 2013.

Consistent with Mr. Malbrough's position was the testimony of his girlfriend, Lindsey Sand, who testified for the state and against him at trial. She confirmed that she did not began [sic] living with Mr. Malbrough until 2004 at his parents' house. She stated that she and the defendant later lived where P.V. lived "for a short period of time, and then moved back to his parents' home. <u>Trial Transcript</u>, June 12, 2013, p. 16, line 1, through p. 17, line 6.

Based on all the available evidence, it is clear that Mr. Malbrough did not live with P.V. at any time in 2003, as she initially claimed in her statement to the police. Therefore, the defendant certainly was not prejudiced by any failure of defense counsel to offer alibi evidence that he lived with his parents the entire year. On the other hand, Mr. Malbrough has not suggested to the court that he had any alibi evidence to offer to counter the trial evidence, and his post trial admission, that he lived with Lindsey Sand in P.V.'s home in 2004, the year in which P.V. claimed at trial that the sexual battery occurred. In the absence of such evidence, the court cannot say that defense counsel's performance was below standard.

For these reasons, post conviction relief based on this assignment of error has been denied.[73]

The Louisiana First Circuit Court of Appeal thereafter denied petitioner's related writ application without assigning reasons.[74] The Louisiana Supreme Court then likewise denied relief, stating: "Applicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[75]

---

[73] Rec. Doc. 25, pp. 631-33.
[74] Rec. Doc. 25, p. 805; *State v. Malbrough*, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).
[75] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).

The undersigned finds that the state court's application of *Strickland* in denying petitioner's claim was reasonable. Although it is true that defense counsel did not present an alibi defense predicated on the fact that petitioner could not have committed the sexual battery in 2003 as alleged in the indictment, the victim testified at trial that the sexual battery actually occurred in **2004, not 2003**. That testimony rendered irrelevant any evidence concerning an alibi for 2003.[76] Counsel is not ineffective for failing to offer irrelevant evidence. *See, e.g., Lawrence v. McCain*, Civ. Action No. 19-13300, 2020 WL 5167594, at *21 (E.D. La. Aug. 4, 2020), *adopted*, 2020 WL 5107298 (E.D. La. Aug. 31, 2020).

Because petitioner has failed to meet his burden to prove that the state court unreasonably applied *Strickland* in its denial of this claim, the AEDPA's deferential standards of review require that the claim likewise be denied in this federal proceeding.

## c. Failure or Refusal to Accept Offered Mistrial (Claim 4)

---

[76] Out of an abundance of caution, the Court further notes that the fact that the victim's trial testimony varied from the timeframe alleged in the indictment is of no moment. Louisiana law expressly provides that "[i]f the date or time is not essential to the offense, an indictment shall not be held insufficient if it does not state the proper date or time, or if it states the offense to have been committed on a day subsequent to the finding of the indictment, or on an impossible day." La. Code Crim. P. art. 468. Moreover, it is clear that "[t]he actual date the offense is alleged to have occurred is not an essential element of the offense of sexual battery." *State v. Stalling*, 290 So. 3d 332, 343 (La. App. 5th Cir. 2020), *writ denied*, 299 So. 3d 76 (La. 2020). "When the date is not an essential element of the offense charged, a mistake respecting the date on which the offense occurred is only a defect as to form, which may be corrected at any time without leave of court." *State v. Brockel*, 733 So. 2d 640, 647-48 (La. App. 5th Cir. 1999), *writ denied*, 748 So. 2d 469 (La. 1999).

Petitioner also claims that his trial counsel was ineffective "when he failed or refused to accept a mistrial offered by the trial judge due to jury contamination."[77] In the state post-conviction proceedings, the state district court denied that claim, holding:

> In his fourth assignment of error, the defendant complains that his trial counsel was ineffective because he failed to accept the court's offer of a mistrial following alleged jury contamination. In his post conviction relief application, the defendant alleges as follows:
>
>> "Furthermore, during a short recess a juror over-heard a conversation by defendant's sister, Miranda Malbrough, and his cousin, Nikki Naquin, in the women's restroom and [proceeded] to return to the jury room and discuss the conversation with several other jurors. The defense counsel was ineffective in his assistance to petitioner due to his not taking the mistrial the judge offered due to jury contamination. He instead wished to continue on with the trial which would not have been the decision of any rational attorney who had his client's best interest in mind."
>
> The facts and circumstances of the incident to which the defendant refers was the subject of much discussion, both at the time of trial and at the post conviction relief hearing conducted in this matter.
>
> The trial court record reveals that on the third day of trial, June 12, 2013, at 5:29 in the evening, immediately after the defendant testified and rested, the court declared a recess, and resumed proceedings about one-half hour later, at 5:55 p.m. According to the minutes, immediately thereafter, the presiding judge met in chambers with both counsel and one of the jurors, Loreta L. Anthony. Upon re-entering the courtroom, the judge placed both Miranda K. Malbrough and Nikki Naquin under oath and questioned them out of each other's presence regarding an incident that had apparently occurred in the women's restroom during the recess. Trial Transcript, June 12, 2013, pp. 151-154.
>
> The court established that Ms. Malbrough and Ms. Naquin were cousins who had been in the women's restroom together during the recess. Ms. Malbrough had testified earlier in the day on behalf of the defendant,

---

[77] Rec. Doc. 5, p. 6.

who was her brother. While in the restroom, the two ladies had some discussion with regard to the case.

According to Ms. Malbrough, she and Ms. Naquin discussed the fact that Ms. Naquin's husband, who was in the military and not at trial, would have been a witness helpful to the defendant because he knew what a good father the defendant was. She admitted that she characterized the testimony of a previous state's witness, Lindsey Sand, as "bullshit," and that she said the witness was not telling the "real truth." She also admitted that one of the jurors was in the restroom at some point while she was expressing her opinions.

According to Ms. Naquin, who was not a witness at the trial, Ms. Malbrough told her in the restroom that she wished she had been asked more questions while testifying because she could have provided more information to the jury.

The court then called in the juror, Ms. Anthony, who confirmed under oath that she heard Mr. Malbrough express "hurt for her brother," concern that everyone might believe Ms. Sand's testimony, and concern that she was not afforded an opportunity to answer more questions on behalf of her brother. According to Ms. Anthony, Ms. Malbrough was unhappy about her inability to visit "the kids," an apparent reference to the defendant's children. Ms. Anthony reported that when she returned to the jury room, she informed other members of the jury about the incident, but no one seemed interested. Upon questioning by the prosecutor, she stated that she understood the statements in the restroom were not evidence and that she would make a decision in the case based on the evidence and without regard to the conversation she heard in the restroom.

When the jury returned to the courtroom, the judge advised the group that he was aware that Ms. Anthony had mentioned the conversation in the restroom to them. He admonished the jury that what Ms. Anthony had told them was not evidence and that they should not be influenced by her statements. The judge than [sic] asked if anyone was going to take those statements into consideration anyway, and suggested the answer "absolutely not." The transcript of the exchange indicates the jurors responded, "absolutely not." <u>Trial Transcript</u>, June 12, 2013, pp. 154-158. At the post conviction relief hearing, Mr. Malbrough admitted that none of the jurors indicated to the contrary.

Then, at the request of defense counsel, there was a bench conference. The transcript reveals there was an "off the record discussion" between

the court and counsel, but there is no record of what that discussion entailed. The trial then resumed. Neither the transcript nor the record nor the minutes of the trial proceedings indicate that either the state or the defendant ever requested a mistrial based on the restroom or jury room conversations, or that the judge unilaterally offered the same.

The defendant contends defense counsel was ineffective because he did not take the court up on an offer of a mistrial due to the alleged jury contamination. He alleges that no rational attorney would have declined such an offer under the same circumstances.

At the post conviction relief hearing in this matter, Mr. Thomas testified that he discussed with the defendant, the possibility of requesting a mistrial, and that the defendant declined. He also said that the judge was concerned that the statements by Ms. Malbrough in the restroom might prove prejudicial to the state, not the defendant. Mr. Thomas testified that the judge personally addressed the defendant regarding the admonishment made to the jury by the court, and that Mr. Malbrough approved the admonishment. The transcript and the minutes of the trial do not reflect that the trial judge directly addressed Mr. Malbrough about the matter. However, the record does reveal that Mr. Malbrough was addressed by Mr. Thomas in open court and asked if he agreed with his recommendation "not to move for a mistrial." Mr. Malbrough responed [sic], "Correct." Trial Transcript, June 12, 2013, p. 166, lines 22-26.

At the same hearing, the defendant testified that he did discuss the possibility of a mistrial with Mr. Thomas. He agreed not to ask for a mistrial because his attorney advised him that a new trial would favor the prosecution.

The court will not grant post conviction relief based on the defendant's fourth assignment of error. Under Louisiana Code of Criminal Procedure article 775:

> "Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial . . . ."

There has been no evidence offered to suggest that the jurors disregarded the court's admonishment. Even if one were to assume that the jury did not abide by the court's instruction to disregard the statements made by Ms. Malbrough in the restroom, it does not appear

that the defendant would have been prejudiced as a result thereof. The statements actually tended to be supportive of Mr. Malbrough's defense in that they implied he was a good guy, that information favorable to him was not being presented, and that the testimony of the state's witness, Ms. Sand, was not reliable. As a result, Mr. Malbrough's right to a fair trial was not impeded. In fact, there is a reasonable argument that the incident in question operated to his advantage. In light of these circumstances, along with trial counsel's consideration of the advantage the state might have enjoyed in the event of a new trial, the court cannot say that Mr. Thomas's failure to request a mistrial amount to deficient performance.[78]

The Louisiana First Circuit Court of Appeal thereafter denied petitioner's related writ application without assigning reasons.[79] The Louisiana Supreme Court then likewise denied relief, stating: "Applicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[80]

The undersigned finds that the state court's application of *Strickland* in denying petitioner's claim was reasonable for the following reasons.

It must first be noted that, as the state district court found in the foregoing ruling, the underlying premise of petitioner's claim (namely, that the trial court unilaterally offered a mistrial) simply is not supported by the record. No such offer is documented in the trial transcript, and no evidence was produced at the state post-conviction hearing to establish that such an offer was made. At that hearing, petitioner's trial counsel testified that the possibility of a mistrial was only discussed

---

[78] Rec. Doc. 25, pp. 633-37.

[79] Rec. Doc. 25, p. 805; *State v. Malbrough*, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).

[80] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).

but that neither the prosecution nor the defense desired a mistrial. Specifically, he

testified:

> We had a hearing in chambers where the juror basically said that the statements, although she had heard some extra judicial information, that she didn't think it would influence her or cause her to be unfair. The real focus was whether it would cause her to be unfair to the State because these were the things Mr. Malbrough wanted in evidence. This was the information he wanted to put in front of the jury that he was not allowed to under the rules of evidence, so it wasn't really a question – the way Judge Ellender looked at it, stated in our conference in chambers, is that he thought it had the potential to prejudice the State, not the defendant. But I did have conversation with Mr. Malbrough and I said I could move for a mistrial if you want me to, but this is the information you wanted to get in front of the jury and he was very clear that he did not want me to move for a mistrial. Bud Barnes, who represented the State, elected not to move for a mistrial and we went back to the trial.[81]

Accordingly, petitioner's allegation that defense counsel failed or refused to accept an

offered mistrial has not been proven.

Nonetheless, even if petitioner could establish that, contrary to the transcript,

the trial court did in fact offer a mistrial to the defense, it does not necessarily follow

that defense counsel was ineffective for failing to accept that offer. As the United

States Fifth Circuit Court of Appeals has noted, "[i]t is oft-recognized that the

decision not to seek a mistrial is frequently a strategic one." *Geiger v. Cain*, 540 F.3d

303, 309 (5th Cir. 2008). Moreover, the Fifth Circuit has further explained that a

"conscious and informed decision on trial tactics and strategy cannot be the basis for

constitutionally ineffective assistance of counsel unless it is so ill chosen that it

permeates the entire trial with obvious unfairness." *Johnson v. Dretke*, 394 F.3d 332,

---

[81] Rec. Doc. 25-1, pp. 206-07.

337 (5th Cir. 2004) (quotation marks omitted); *accord Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993) ("Given the almost infinite variety of possible trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate strategic choices.").

Here, the undersigned cannot say that, even if a mistrial was in fact offered, defense counsel's decision not to accept a mistrial in these circumstances would have been so wrongheaded as to be unreasonable. That is so because, obviously, mistrials do not always benefit the defense. For example, when a mistrial is declared and the case must be tried again from scratch, there is always a risk that in the new trial a less favorable jury might be empaneled or the state might bolster and present its case more effectively. Faced with such considerations, counsel, who knows his case and was present for the trial, is generally in the best position to weigh the relative benefits of proceeding to a verdict against attempting to force a retrial by moving for mistrial. Accordingly, a habeas court, whose knowledge of a case is limited to a cold record, should second-guess trial counsel's decisions on such matters only in the most egregious circumstances.

And this is not such a circumstance. That is especially true given the fact that it was the prosecution, **not the defense**, that was possibly adversely affected by the jury contamination. Again, as petitioner's trial counsel testified at the post-conviction hearing: "**The judge did not think there was any prejudice to the defendant**

**at all**. … [H]e felt like the State may have been prejudiced by the out of court statements of the defense witnesses."[82]

For these reasons, petitioner has failed to meet his burden to prove that the state court unreasonably applied *Strickland* in its denial of this claim. Accordingly, the AEDPA's deferential standards of review require that the claim likewise be denied in this federal proceeding.

**d. Failure or Refusal to Object to Introduction of Video Evidence (Claim 5)**

Lastly, petitioner claims that his trial counsel was ineffective "when he failed or refused to object to the state's introduction of video evidence the defense had not previously seen."[83] In the state post-conviction proceedings, the state district court denied that claim, holding:

> The defendant's fifth assignment of error alleges that his trial counsel was ineffective for failing to object to the state's presentation of video evidence defense counsel had not previously seen.
>
> In support of the defendant's claim, he states the following:
>
>> "Mr. Thomas made arrangements for petitioner and himself to go to the district attorney's office to view several video tapes the district attorney had against petitioner. After viewing only two (2) videos petitioner asked to see all other videos of interviews of potential victims and/or witnesses. At that time the forensic interviewer Dawn [Buquet], told petitioner and his attorney that the other interviews were audio recordings only. Petitioner nor his attorney ever seen or heard any other tapes, despite the fact that the detectives had interviewed at least two (2) other alleged victims and two (2) other witnesses. At trial the state introduced a video taped interview of the alleged stalking victim that the defense had never seen, which

---

[82] Rec. Doc. 25-1, p. 241 (emphasis added).
[83] Rec. Doc. 5, p. 7.

> under La. R.S. 15:440.5(A)(7) was inadmissible. Mr.
> Thomas failed to object despite the fact that petitioner
> pointed out to Mr. Thomas that the said video was
> inadmissible under La. R.S. 15:440.5(A)(7)."

Later in his application for post conviction relief in support of
assignment of error number twelve, the defendant alleges the following
with regard to the videotaped statement of the stalking victim, C.G.:

> "The petitioner asked his trial attorney if he had seen the
> video and petitioner's attorney said "no." Petitioner then
> pointed out to his attorney that since neither petitioner nor
> his attorney had seen the video, it was inadmissible under
> La. R.S. 15:440.5(A)(7), yet petitioner's attorney failed to
> object and thus allowed the state to proceed with
> introducing the video."

The videotape referred to by the defendant was received into evidence
on the second day of trial, June 11, 2013, during the direct examination
of the state's witness, Detective Travis Theriot. It was marked as
Exhibit S-5, and offered by the state in support of its prosecution of the
defendant for one count of the amended indictment, i.e., stalking of a
person under the age of eighteen. The defendant's counsel, Mr. Thomas,
did not object to the introduction of the videotaped statement. Trial
Transcript, June 11, 2013, p. 128, lines 7-14.

The videotape was played for the jury later during the trial that same
day, during the testimony of C.G., who was called as a witness by the
state. Trial Transcript, June 11, 2013, pp. 164-167. This item of
evidence, which the court has reviewed, consists of a videotape, with
audio, of a recorded interview with the state's witness, C.G., by Houma
Police Department Detective Travis Theriot, on December 16, 2011, at
the Houma Police Department. C.G. was twelve years old at the time
she testified in court, but only ten years old at the time of her interview.

In the taped interview, C.G. reported that the defendant had passed her
school numerous times that week, followed her school bus, blew her
kisses, and gave her a note with instructions to read it. During the
interview, she identified the defendant in a photographic lineup
presented to her, apparently for the second time.

In this assignment of error, the defendant alleges trial counsel was
ineffective because he did not object to the admission of the videotape
into evidence. The only reason he has suggested that the evidence of the

taped interview was inadmissible is because neither he nor his attorney had seen the videotape prior to the time it was offered as evidence by the state. He contends that the offer of the videotape and admission of same into evidence violated the dictates of La. R.S. 15:440.5(A)(7), which provides as follows:

> "A.    The videotape of an oral statement of the protected person made before the proceeding begins may be admissible into evidence if:
>
> ***
>
> (7)    The defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence…."

A careful reading of La. R.S. 15:440.5(A)(7) reveals that the videotape in question would have been admissible as long as Mr. Malbrough or his attorney, Mr. Thomas, were "afforded an opportunity to view the recording" before it was offered into evidence. It is not a prerequisite to admission of the item into evidence that the defendant or counsel actually view the evidence. The statute only requires that either of them have an opportunity to do so.

In his post conviction relief application, the defendant alleges that he did not see the videotape before trial and that Mr. Thomas admitted to him during the trial at the time the videotape was played for the jury, that he had not previously viewed the videotape either. For purposes of this assignment of error, that point is irrelevant. The issue is whether Mr. Thomas, at least, was afforded a pre-trial opportunity to view the videotape.

At the post conviction relief hearing in this matter, Mr. Thomas testified that no evidence was offered at trial that he had not previously seen. Mr. Malbrough testified that he was not sure what evidence his attorney had viewed, including the videotaped statement of C.G. He was adamant, however, that when he and his attorney visited the District Attorney's office prior to trial to view videotaped evidence together, he was told that only two videotaped statements existed, both of A.V., the victim of the aggravated rape. On that day, he and his attorney viewed those videotapes, and no other, including any videotaped statement of C.G.

The court is not exactly sure what representations were made to the defendant regarding the existence of videotaped statements other than the two statements made by A.V., when he accompanied Mr. Thomas to the District Attorney's Office. The two videotaped statements of A.V., were described as "CAC tapes," and they were viewed by Mr. Thomas and Mr. Malbrough in the company of a woman. The court surmises that, as asserted by Mr. Malbrough, the female was Dawn Buquet, the interviewer at the Child Advocacy Center (CAC) who conducted the interviews of A.V. depicted in the two videotapes, which the court has reviewed. The third videotape which Mr. Malbrough questions was not a videotape of a statement taken by Ms. Buquet, but by Detective Travis Theriot with the Houma Police Department. It is entirely reasonable that Ms. Buquet may not have known of the existence of that videotaped statement taken by another individual at another location with regard to a different matter.

In any event, the court is not convinced that Mr. Thomas did not view the videotaped statement of C.G. before it was admitted into evidence. The court is even less convinced that the video tape was not made available to him prior to trial, whether he viewed it or not. Even if he failed to view it, that fact alone would not have prevented its lawful introduction into evidence under La. R.S. 15:440.5(A)(7), because it was available for viewing. Detective Travis Theriot brought the videotape to court at the time of trial as part of the evidence in possession of the Houma Police Department since May 16, 2011. <u>Trial Transcript</u>, June 11, 2013, p. 127, lines 16-20. The minutes of the court reflect that on December 19, 2012, in the presence of Mr. Thomas, the prosecutor offered open file discovery to the defendant.

For these reasons, any objection by Mr. Thomas to the introduction of the evidence based on La. R.S. 15:440.5(A)(7), would have been denied. Therefore, no relief will be granted with regard to this assignment of error by the defendant.[84]

The Louisiana First Circuit Court of Appeal thereafter denied petitioner's related writ application without assigning reasons.[85] The Louisiana Supreme Court then likewise denied relief, stating: "Applicant fails to show that he received ineffective

---

[84] Rec. Doc. 25, pp. 637-40.
[85] Rec. Doc. 25, p. 805; *State v. Malbrough*, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).

assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[86]

The undersigned finds that the state court's application of *Strickland* in denying petitioner's claim was reasonable for the following reasons.

As a preliminary matter, it has not been established whether defense counsel had in fact reviewed the video in question prior to trial. At the post-conviction hearing, he testified on cross-examination that he had reviewed all of the prosecution's evidence prior to trial:

> Q.　　… During your preparations for this trial were you offered open file discovery by the State?
>
> A.　　Yes.
>
> Q.　　And did you exercise that right to open file discovery?
>
> A.　　Yes.
>
> Q.　　And within your knowledge did you receive everything and review everything that the State had?
>
> A.　　Yes.
>
> Q.　　And was there any evidence that was admitted into – any piece of evidence that was admitted at the trial that you had not reviewed?
>
> A.　　No.[87]

Nevertheless, on redirect, he acknowledged that was not entirely accurate, in that he had not in fact reviewed a particular expert report.[88]

---

[86] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).
[87] Rec. Doc. 25-1, pp. 240-41.
[88] Rec. Doc. 25-1, pp. 252-55.

Ultimately, however, whether defense counsel in fact reviewed the video prior to its introduction is of no moment. As the state court explained, regardless of whether he reviewed it, the video was admissible at trial so long as it was made available to defense counsel for review. And, here, it is undisputed that the prosecution offered the defense complete "open file" discovery. Therefore, the objection petitioner now proposes would have been meritless. Counsel is not ineffective for failing to make a meritless objection. *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); *see also United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

Because petitioner has failed to meet his burden to prove that the state court unreasonably applied *Strickland* in its denial of this claim, the AEDPA's deferential standards of review require that the claim likewise be denied in this federal proceeding.

## 2. Appellate Counsel (Claims 6 and 7)

Petitioner next claims that his appellate counsel was ineffective in two respects. Before addressing petitioner's specific allegations of ineffective assistance of appellate counsel, the state district court first summarized the law concerning such claims as follows:

> Allegations of ineffective assistance of appellate counsel are reviewed under similar standards established for trial counsel under <u>Strickland</u>,

*supra.* State v. Collins, 677 So.2d 500 (La. App. 3rd Cir., 1996); State v. Guillory, 670 So.2d 301 (La. App. 3rd Cir., 1996). However, if the defendant demonstrates an unprofessional error on the part of appellate counsel, the defendant's burden with regard to the second element under Strickland is not to show the error was so serious as to deprive him of a fair trial. Rather, his burden is to show that the error operated to his prejudice.[89]

That is a correct summary of the applicable law. As the state court noted, like claims concerning trial counsel, claims of ineffective assistance of appellate counsel are analyzed under *Strickland. See, e.g., Henderson v. Quarterman*, 460 F.3d 654, 665 (5th Cir. 2006). The only difference concerns the prejudice prong of the analysis. Where it is claimed that appellate counsel was ineffective, the prejudice prong of the analysis turns on whether there is "a reasonable probability that, but for appellate counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (cleaned up). That requires a court to "counter-factually determine the probable outcome on appeal had the performance not been deficient." *Id.* (quotation marks omitted). In other words, to prevail on such a claim, a petitioner must show that there is "a reasonable probability that, but for" the deficient performance of his appellate counsel, the petitioner "would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *accord Halprin v. Davis*, 911 F.3d 247, 260 (5th Cir. 2018).

The district court then proceeded to address petitioner's specific ineffective assistance of appellate counsel claims as follows.

**a. Failure or Refusal to Assert All Appealable Grounds on Appeal (Claim 6)**

---

[89] Rec. Doc. 25, p. 640.

Petitioner claims that his appellate counsel was ineffective "when she failed or refused to bring up all appeal-able grounds on direct appeal including but not limited to the ones brought up in this pro se post conviction relief application."[90] In the state post-conviction proceedings, the state district court denied that claim, holding:

> The defendant first alleges his appellate counsel was ineffective for failing to present all appealable issues to the First Circuit Court of Appeal. He specifically mentions all issues which he has described in the post conviction relief petition filed by him herein.
>
> Attached to the defendant's post conviction relief application is a copy of a letter to the defendant from his appellate counsel. The letter is dated October 7, 2013, about three months before January 6, 2014, when counsel filed the brief on the defendant's behalf with the appellate court. In the letter, counsel referenced a letter dated September 23, 2013, from the defendant to her. In response to the defendant's letter she wrote:
>
>> "In your letter your expressed dissatisfaction with your trial attorney. Ineffective assistance of counsel is an issue that is more properly raised in Post Conviction Relief if we are unsuccessful in having your conviction overturned on appeal."
>>
>> "You also discussed some of the facts of your case and issues that you believe may be raised on appeal. I will prepare your brief from the record that is sent to me by the court of appeal....I am limited to raising issues that were preserved for appeal by a motion or objection at trial by your trial attorney and the facts and evidence that appear in the record."
>
> The record in this case reveals that appellate counsel presented only one assignment of error, i.e., the denial by the trial court of the defendant's motion to sever. The Court of Appeal found that assignment of error to be without merit.
>
> Mr. Malbrough now asserts that appellate counsel's performance was below an objective standard of reasonableness because she failed "to properly examine the record for all possible appellable [sic] errors/issues

---

[90] Rec. Doc. 5, p. 8.

despite petitioner bringing several to her attention including ineffective assistance of his trial attorney." The defendant does not specify what issues he thinks appellate counsel should have pursued or what other issues he called to her attention other than those discussed herein as assignments of error.

The court first notes that appellate counsel correctly advised the defendant that errors based on ineffective assistance of counsel are not matters that can be addressed by direct appeal. Those are matters to be considered by an application for post conviction relief.

The single issue considered by the court of appeal in this case was the defendant's complaint that the trial court improperly denied his request for severance of the three counts in the amended indictment. The defendant alleges that appellate counsel should have pursued an appeal of all issues raised in his post conviction relief petition. Not counting those assignments of error based on ineffective assistance of counsel, there are seven such issues, to wit, those issues addressed herein as Assignment of Error No. 1 (Excessive Sentences), Assignment of Error No. 8 (Motion for Mistrial Based on Inadmissible Evidence), Assignment of Error No. 9 (Unsigned Amended Indictment), Assignment of Error No.10 (State Sponsored Perjured Testimony), Assignment of Error No. 11 (Denial of Right to View Evidence), and Assignment of Error No.12 (Introduction of Unseen Video Evidence[]], and Assignment of Error No. 13 (Incomplete Record on Appeal).

The court has determined elsewhere herein that the assignments of error numbered eight through thirteen, inclusive, are not well founded. Therefore, because the defendant did not suffer any prejudice for failure of appellate to pursue an appeal of those matters, no relief will be granted for alleged ineffectiveness of appellate counsel on those grounds.

With regard to Assignment of Error No. 1 (Excessive Sentences), the court has already pointed out that the issue is not ripe for decision because this court must first act on the defendant's unresolved motion to reconsider sentence filed August 26, 2013. Therefore, any failure of appellate counsel to pursue this issue on appeal has not prejudiced the defendant. Therefore, post conviction relief for the alleged ineffective assistance of appellate counsel for failure to pursue an appeal of these issues has been denied.[91]

---

[91] Rec. Doc. 25, pp. 640-42.

The Louisiana First Circuit Court of Appeal thereafter denied petitioner's related writ application without assigning reasons.[92] The Louisiana Supreme Court then likewise denied relief, stating: "Applicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[93]

The undersigned finds that the state court's application of *Strickland* in denying petitioner's claim was reasonable for the following reasons.

It is clear that appellate counsel "is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)." *West v. Johnson*, 92 F.3d 1385, 1396 (5th Cir. 1996). Rather, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions." *Id.* at 753.

As a result, when assessing a claim alleging ineffective assistance of appellate counsel, a court instead looks to whether the issues ignored by appellate counsel were "clearly stronger" than the issues actually presented on appeal. *See, e.g., Diaz v. Quarterman*, 228 F. App'x 417, 427 (5th Cir. 2007); *accord Smith v. Robbins*, 528 U.S.

---

[92] Rec. Doc. 25, p. 805; *State v. Malbrough*, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).
[93] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).

259, 288 (2000). Here, although the severance claim appellate counsel asserted on appeal was ultimately unsuccessful, it can hardly be said that the claims petitioner now proposes were "clearly stronger."

That is especially true with respect to any contention that appellate counsel was ineffective for failing to raise the foregoing ineffective assistance of trial counsel claims on appeal. That is so because not only are the foregoing claims meritless for the reasons already explained, but also because Louisiana law in fact **discourages** the assertion of such ineffective assistance of claims on direct appeal. *See, e.g., State v. Truitt*, 500 So. 2d 355, 359 (La. 1987) ("The appropriate avenue for asserting a claim for ineffective assistance of counsel is through postconviction relief, not by direct appeal."). Obviously, counsel performance is not deficient, and no prejudice results, where, as here, appellate counsel's actions conform to such state court norms and her client does not lose the opportunity to have his claims addressed later at a more appropriate time. *See, e.g., Bruce v. Deville*, Civ. Action No. 18-5323, 2019 WL 1062466, at *17 (E.D. La. Jan. 28, 2019) ("It is a well-settled that Louisiana laws deems that claims of ineffective assistance of trial counsel are more properly raised in an application for post-conviction relief in the district court rather than on direct appeal. As such, [petitioner]'s appellate counsel did not act deficiently in failing to raise on appeal claims of ineffective assistance of trial counsel. Even if the failure to do so could be considered deficient, [petitioner] not prejudiced by the failure since the state appellate court likely would have deferred the claims to post-conviction review,

which [he] later pursued." (citations omitted)), *adopted*, 2019 WL 1056854 (E.D. La. Mar. 6, 2019).

Appellate counsel was likewise not ineffective for failing to raise on direct appeal the other claims petitioner has asserted herein. For the reasons explained in detail in this Report and Recommendation, not one of petitioner's claims has any merit. And, simply put: appellate counsel is not ineffective for failing to raise a meritless claim. *See, e.g., Anderson v. Quarterman*, 204 F. App'x 402, 410 (5th Cir. 2006) ("The issues that Anderson argues his counsel should have raised on direct appeal ... lack merit. As such, failure to raise these issues did not prejudice Anderson.").

Finally, to the extent that petitioner is arguing that there are other claims counsel was ineffective for failing to raise, he has not established that relief is warranted because he has not identified the nature and substance of those purported claims. Because he has not identified even those claims, he necessarily has not shown that the claims, whatever they may be, were any stronger than the severance claim asserted by appellate counsel on direct appeal.

Petitioner has failed to meet his burden to prove that the state court unreasonably applied *Strickland* in its denial of this claim. The AEDPA's deferential standards of review thus require that the claim likewise be denied in this federal proceeding.

## b. Advice to Forgo Further Direct Review (Claim 7)

Petitioner also claims that his appellate counsel was ineffective "when she advised petitioner than an application for writs to the Louisiana Supreme Court in her professional opinion would not be granted."[94] In the state post-conviction proceedings, the state district court denied that claim, holding:

> The defendant's second allegation against his appellate counsel is that she was ineffective for suggesting to him that his efforts to seek review by the Louisiana Supreme Court of the unfavorable court of appeal decision would not be successful. The defendant attached to his post conviction relief application a copy of a letter dated April 27, 2014, from appellate counsel to Mr. Malbrough. After informing the defendant that his appeal of the trial court decision refusing to sever the charges against him was unsuccessful, and that the First Circuit Court of Appeal affirmed his convictions and sentences, appellate counsel advised him as follows:
>
>> "You can file an application for writs to the Louisiana Supreme Court. We will not do so. Indeed, this action by the appellate court ends our work on your behalf. It is our considered professional opinion that such an application would not be granted, based on our consideration of Supreme Court rules. If you chose to file such an application, you will have to file it within thirty (30) days of the date on the decision. The prison library has forms and court rules on how to file such applications. There may be some help available to you in the prison or you may retain an attorney to handle this application."
>
> The court is hard-pressed to understand how appellate counsel's duty to the defendant was breached because she merely expressed her opinion that seeking writs from the Louisiana Supreme Court would be futile. She clearly explained to the defendant by way of her letter that despite her opinion, the defendant had a right to seek writs, either personally or though counsel.
>
> This assignment of error is without merit.[95]

---

[94] Rec. Doc. 5, p. 9.
[95] Rec. Doc. 25, pp. 642-43.

The Louisiana First Circuit Court of Appeal thereafter denied petitioner's related writ application without assigning reasons.[96] The Louisiana Supreme Court then likewise denied relief, stating: "Applicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[97]

The undersigned finds that the state court's application of *Strickland* in denying petitioner's claim was reasonable for the following reasons.

The United States Supreme Court made clear "that counsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment, and that the burden to show that counsel's performance was deficient rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013) (citations and quotation marks omitted). Here, counsel advised petitioner that a Louisiana Supreme Court writ application was unlikely to be successful, and petitioner has not met his burden to show that the advice was inadequate or unreasonable.

Because petitioner has failed to meet his burden to prove that the state court unreasonably applied *Strickland* in its denial of this claim, the AEDPA's deferential standards of review require that the claim likewise be denied in this federal proceeding.

## C. Denial of Mistrial (Claim 8)

---

[96] Rec. Doc. 25, p. 805; *State v. Malbrough*, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).

[97] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).

Petitioner next claims that his constitutional rights were violated when the trial judge "erred in denying defense's motion for a mistrial due to prosecution entering inadmissible other crimes evidence."[98] In the state post-conviction proceedings, the state district court denied that claim, holding:

> The defendant's eighth assignment of error alleges that the trial court improperly denied his motion for a mistrial after the jury received inadmissible evidence of other crimes or other bad acts by the defendant. The state alleges that this claim should be denied based on Louisiana Code of Criminal Procedure article 930.4(C), which states:
>
> > "If the applicant alleges a claim which the petitioner raised in the trial court and inexcusably failed to pursue on appeal, the court shall deny relief."
>
> Of course, if the court finds this claim was raised in the trial court, but that the defendant inexcusably failed to pursue the same on appeal, that implicates the defendant's right to effective assistance of appellate counsel, an issue which he has raised by way of his sixth assignment of error discussed above. Therefore, it is appropriate for the court to consider the merits of his claim by the defendant.
>
> According to Mr. Malbrough:
>
> > "The prosecutor entered into evidence several audio recordings of petitioner's phone conversations while he was in the parish jail. In one (1) of which the petitioner mentioned to his mother about how high his bond was set compared to a previous bomb charge petitioner had been arrested on. The state should have redacted mention of the prior charge before entering the audio recording in to evidence. Therefore not violating C.E. Art. 404(B)(1) since said prior charge did not fall under C.E. Art. 412.2."
>
> > "Petitioner's trial attorney filed a motion for mistrial on these grounds and the trial judge sided with the prosecutor and denied defense's motion. (See trial trans. pgs. 422-424)"

---

[98] Rec. Doc. 5, pp. 10-11.

On April 10, 2013, two months before the defendant's trial, the state filed in the record of this proceeding, a written "Notice of Intent to Use Inculpatory Statements." By way of this notice, the state advised the defendant that it intended to offer as evidence at his trial, among other statements:

> "Statements made by Lindsey Sand, Cheryl Malbrough, Tommy Malbrough and Paul Lapeyrouse, Jr. over the jail phone from the time of his arrest until present."

On June 10, 2013, the first day of the defendant's trial, defense counsel filed a written motion styled, "Motion in Limine to Prevent Introduction of Testimonial Hearsay." The motion referenced the telephone conversations over the jail phone described in the state's aforementioned notice. Defense counsel pointed out that the conversations included parties other than Mr. Malbrough. He asked the court to "prevent the State from introducing any hearsay statements or evidence at his trial." The court set an immediate hearing on the defendant's motion, which took place just before voir dire of the first jury panel. The trial transcript reveals that defense counsel's focus at the hearing was his attempt to be sure the other parties to the telephone conversations would be available to testify at the trial. He did not mention objectionable references to other crimes or bad acts of the defendant that might have been referred to by anyone during the telephone conversations. After argument, the court denied the motion without explanation, and Mr. Thomas asked that his objections be noted for the record. <u>Trial Transcript</u>, June 10, 2013, pp. 30-32.

The next day, June 11, 2013, the second day of trial, during the direct examination of Detective Travis Theriot, a state witness, the prosecutor offered into evidence, four recorded telephone conversations to which the defendant was a party while incarcerated after his arrest on the charges in this case. That evidence consisted of the following:

> (1)  An audio recording of a telephone conversation between the defendant and his girlfriend, Lindsey Sand, on December 17, 2011, identified as call number 3;
>
> (2)  An audio recording of a telephone conversation between the defendant and his mother, Cheryl Malbrough, on December 17, 2011, identified as call number 4;

(3) An audio recording of a telephone conversation between the defendant and his friend, Paul Lapeyrouse, Jr., on January 6, 2012, identified as call number 8;

(4) An audio recording of a telephone conversation between the defendant and his mother, Cheryl Malbrough, on January 6, 2012, identified as call number 11.

Detective Theriot testified that he monitored and recorded a total of twenty-four telephone calls in which the defendant participated at the jail. The recorded telephone conversations offered as evidence by the state were identified by Detective Theriot as calls 2, 4, 8, and 11. Trial Transcript, June 11, 2013, pp. 133-141. All of the audio recordings and a transcript of each recording were accepted as evidence by the court as state exhibit S-7, in globo. Defense counsel did not object to the introduction of any of these items of evidence except the audio recording and transcript of the call identified as call number 8, a telephone call between the defendant and his friend, Paul Lapeyrouse, Jr. In connection with the objection the following colloquy occurred between Mr. Thomas and the court:

"BY MR. THOMAS:

Your Honor, I am going to re-urge my earlier objection to Call Number 8, because this is the one where I don't know if Mr. Lapeyrouse is available."

"BY THE COURT:

Same ruling as before."

"BY MR. THOMAS:

Note our objection."

Defense counsel did not mention any objection to any telephone recording based on an [sic] reference therein to any other crimes or bad acts by the defendant.

All of the audio recordings were played in court for the jury to hear, and transcripts of the same were made available to the jury while they listened to the recordings. The court has listened to all the audio recordings, including the recording of the telephone conversation between the defendant and his mother on December 17, 2011, identified

as call number four. During that part of the conversation in which the defendant was complaining to his mother about his $500,000.00 bond for the stalking charge and two other misdemeanor charges, he said:

> "They trying to set me up they trying to get me for something or something because I mean I had a bomb charge and it was only a 100,000 a 150,00 [sic] I mean …."

Following the testimony of Detective Theriot, the court heard from three additional state witnesses and then adjourned court for the day.

At the beginning of the next day of trial, June 12, 2013, and as the first item of business, the following exchange by and among defense counsel, the prosecutor, and the court took place outside the presence of the jury:

> "BY MR. THOMAS:
>
> Your Honor, John Thomas on behalf of Cliff Malbrough. Your Honor, I want to make a Motion for Mistrial, because based on something that happened during the testimony yesterday, when the phone call number 4 was being played, the jail – I am referring to the jail phone calls. There was a conversation between the defendant and his mother. There was a reference to another crime – when he is talking about not being able to get a bond, he says, "I had a bomb charge," B-O-M-B, bomb charge and the bomb was only $100,000 or $150,000.00. He is complaining about how high his bond is. The reason for the Motion for Mistrial is I think this is a reference to "other crimes" evidence. It does not fall under 412, or 404(B), it is completely unrelated to the charges he is facing now. But it is prejudicial – highly prejudicial and I can't think of anything other than being a child molester being accused of being a bomber or – with the Boston bomber and all of that in the news. It should have been taken out of there. I didn't catch it at the time and when I heard it, I didn't want to jump up and call even more attention to it. But I think it is grounds for a mistrial. On that basis, I would move the Court for a mistrial."
>
> "BY THE COURT:
>
> Mr. Barnes?"
>
> "BY MR. BARNES:

Well, Your Honor, the defense has had these transcripts of these jailhouse conversations for over a month. You asked the defense, I would rather have taken a lot of these statements he made out of context and not played the whole tape. I didn't think that was proper. You asked the defense if it had anything in the tapes that they are aware of that we needed to redact; and they said no. I just don't think based on the fact that they have had time to review this; they didn't point it out to us ahead of time; and they didn't argue this before, it is not somebody else's accusation against him, it's just something he came up with, in an unprivileged, unprivate conversation and I think even if it is improper, it is harmless. It is just something mentioned by him and then move on. But they should have made this objection before we got into and played the tape, and maybe we could have dealt with it."

"BY MR. THOMAS:

Judge, if I may – "

"BY THE COURT:

Reply?"

"BY MR. THOMAS:

Twenty-four (24) transcripts of lengthy phone calls. When I read it, there was – in a paragraph about bond, B-O-N-D, and when I saw the word bomb, I didn't catch it. I thought they were talking about a bond, and then when I heard it, I realized that he is talking about a separate charge involving an explosive. And it is clearly inadmissible, "other crimes" evidence. Numerous cases say that referencing another crime, especially something he wasn't convicted of is grounds for a mistrial."

"BY MR. BARNES:

And it's the defendant's own reference and they had plenty of time, if he wanted to redact the thing, and take it out. It doesn't have anything to do with this case."

"BY THE COURT:

For the reasons cited by the District Attorney, the Motion is denied. I asked the question and didn't get anything from the defense. When it happened, we could have had a side bar and admonished the jury about it. But, you didn't do it, so for that reason, the Motion is denied …."

Trial Transcript, June 12, 2018, pp. 3-5.

After denial of the motion, the court heard arguments regarding a defense motion to quash the amended indictment with regard to the stalking charge. The trial transcript reflects that following denial of that motion, there was brief pause in the proceedings while the "court and law clerk held discussions." Immediately thereafter, the following conversation took place between defense counsel and the judge:

"BY THE COURT:

All right, and with regards to the bomb, which I didn't hear the word "bomb" – of course, I didn't have the transcript, I am offering you an instruction if you want to the jury to disregard it. However, it very well may call attention to it. But, it is up to you – if you want a statement to the jury about disregarding that, I will be happy to do so. And if you want one, give me exactly what you want me to tell the jury and I will be happy to do it."

"BY MR. THOMAS:

Judge, I think it will just call more attention to it."

"BY THE COURT:

All right, then I won't."

Trial Transcript, June 12, 2013, p. 6, line 24, through p. 7, line 5.

Defense counsel did not thereafter request an admonition to the jury regarding the reference in the recording of call number 4 to a "bomb charge," and no such admonition was given by the court at the defendant's trial. The court has reviewed the instructions given by the

presiding judge to the jury after presentation of all evidence. Among the more than forty pages of jury instructions, there was this charge given:

> "You must remember however that the defendant is on trial only for the offenses charged. You may not find the defendant guilty because of these offenses merely because he may have committed another offense in the past."

Based in the foregoing, it is apparent that the focus of defense counsel's initial objection to the introduction into evidence of any of the recorded jail conversations was based on his concern that the statements of the parties to the conversations, except for the defendant, constituted hearsay and should not be admissible. It was not until the day after the audiotapes were admitted into evidence and played for the jury, that defense counsel posed any other objection regarding the evidence, specifically evidence of call number eight [sic]. It was in that call that the defendant referred to a previous "bomb charge" for which he was arrested, but never convicted. It is clear that the defendant's comments regarding his previous arrest referred to another crime committed or alleged to have been committed by him. These comments, captured by the state and offered as evidence against the defendant by the state, should not have been admitted into evidence, much less made available to the jury by way of a recording played in open court and by way of a written transcript of the comments furnished to each juror.

Article 404(B) of the Louisiana Code of Evidence provides in pertinent part as follows:

> "... evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding."

As a general proposition, other crimes evidence is inadmissible at the trial of a defendant. However, as provided by article 404(B), such evidence may be admitted as in order to prove certain specific

enumerated things, i.e. motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or accident. However, if requested by the accused, the state must provide pre-trial reasonable notice of the nature of any such evidence. If the state contends that the other crimes evidence relates to conduct that constituted an integral part of the act or transaction that is the subject of the present prosecution, the same pre-trial notice is required, again, if requested by the accused.

The record in this case reveals that court-appointed counsel for the defendant who represented him until Mr. Thomas was hired as private counsel, filed a motion for discovery and inspection on May 23, 2012, and made the following specific request:

> "UPON FURTHER MOTION of the defendant, that this Honorable Court shall order the Prosecutor to inform the defendant of Prosecutor's intent to offer evidence of the commission of any other crime(s) admissible under the authority of La. Code of Evidence Article 404."

A hearing on the defendant's motion was scheduled for August 29, 2012, but did not take place because of weather conditions caused by Hurricane Isaac. However, on December 19, 2012, the prosecutor, apparently in response to the May 23, 2012, motion, announced in open court while Mr. Thomas was present for the defendant, that open file discovery would be provided to defense counsel. There was no specific mention of other crimes evidence, and there were no subsequent pleadings or court proceedings that mentioned the possibility that other crimes evidence might be offered at trial.

The court does not believe that the written "Notice of Intent to Use Inculpatory Statements" furnished to the defendant by the prosecutor on April 10, 2023, was intended by the state to comply with the requirement of pre-trial notice in Louisiana Code of Evidence article 404(B). There is a reasonable argument, however, that the written notice given, together with the offer of open file discovery, constituted sufficient written notice to the defendant that the state intended to offer the other crimes evidence reflected by jail call number eight [sic]. There is an equally reasonable argument that in the absence of specific written notice of the state's intent to offer other crimes evidence, the defendant had no reason to expect that the state would permit inadmissible evidence of any other crime by the defendant to be presented to the jury.

In any event, the other crimes evidence received by the jury was clearly inadmissible. None of the exceptions to the general rule of inadmissibility provided by Louisiana Code of Evidence article 404(B) apply in this case. Further, there are no grounds to support any contention that the "bomb charge" conduct constituted and integral part of the acts or transactions for which the defendant was on trial in this case. Defense counsel admitted that he did not "catch" the reference by the defendant in call number eight [sic] to his alleged involvement in a previous crime prior to trial, even though he had previously reviewed the audiotape recording. The prosecutor admitted the inadmissibility of the evidence when he addressed the court on June 12, 2013. When the trial judge offered to admonish the jury, he implicitly recognized the legal error that had occurred. The fact remains, however, that the inadmissible other crimes evidence was received by the jury and no direct contemporaneous admonition was given to them.

Louisiana Code of Criminal Procedure article 770 provides for a mandatory mistrial on motion of the defendant, as follows:

> "Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly to:
>
> ***
>
> (2)   Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible ….
>
> ***
>
> An admonition to the jury to disregard the remark or a comment shall not be sufficient to prevent a mistrial …."

Louisiana Code of Criminal Procedure article 771, provides for the possibility of a mistrial, in accordance with the following provisions:

> "In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature

that it might create prejudice against the defendant, or the state, in the mind of the jury:

***

(2)  When the remark or comment is made by a witness or a person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.

In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial."

The reference to other crimes evidence by the defendant in the audio recording played to the jury, would not have activated the mandatory mistrial requirement of article 770. Although the evidence was inadmissible, the statement was not made by "the judge, district attorney, or a court official."

The defendant's statement about the "bomb charge," however, when revealed to the jury, triggered the application of article 771. When defense counsel requested a mistrial, he, in effect, was taking the position that the admonition to the jury called for by article 771 was not sufficient to assure the defendant a fair trial. Initially, the court's response to the motion was to find fault with defense counsel for failing to discover the problematic statement made by the defendant before the evidence was presented in court. Curiously, the court did not seem concerned that the state was the party who had offered the inadmissible evidence in the first place without any direct pre-trial notice of other crimes evidence to the defendant. When the court offered to belatedly admonish the jury, the court, in effect, was taking the position that the defendant was not entitled to a mistrial, and that an admonition was sufficient to assure the defendant a fair trial. The defendant declined the court's offer, calculating that, as a matter of strategy, the admonition would only draw more attention to the inadmissible statement, and thus diminish the fairness of the defendant's trial.

The defendant has now called upon this court by way of his post conviction relief application, to grant him a new trial because of the improper receipt of the other crimes evidence by the jury in this case. To do so, this court would have to conclude that the presiding judge was wrong when he concluded an admonition to the jury about the matter was sufficient to assure the defendant a fair trial. The court is not

convinced the presiding judge's decision was incorrect. The "bomb charge" was mentioned only once, and no other reference thereto was made in the presence of the jury by anyone at any other point in the trial. In addition, the court advised the jury during its charges that the defendant could not be convicted just because the jury thought he committed some other crime in the past. Finally, the defendant testified in his own defense, and his uncontradicted testimony to the jury included his admission to two prior criminal convictions that did not include any "bomb charge." For these reasons, the court now, just like the presiding judge at the time, does not think the other crimes evidence mentioned to the jury affected the defendant's right to a fair trial, in light of the offer of an admonition.

Of course, a direct, contemporaneous admonition to the jury regarding the other crimes evidence was not given because defense counsel, as a matter of strategy, declined the offer of an admonition. One might suggest that failure of defense counsel to insist on the admonition constituted ineffectiveness of counsel. Yet had counsel insisted on such an admonition, one might argue that such insistence constituted ineffectiveness of counsel for drawing undue attention to the other crimes evidence.

If the alleged error by defense counsel falls within the ambit of trial strategy, it does not establish deficient performance by counsel. Because opinions may differ on the advisability of certain tactics, hindsight is not the proper perspective for judging the competence of trial counsel's decisions. Whether a particular strategy is successful or not is not determinative of the issue of counsel's alleged deficiencies. State of Louisiana v. Green, 750 So. 2d 343 (La. App. 4th Cir., 1999).

For these reasons, the court does not find that trial counsel's performance in declining the court's offer of an admonition was deficient.[99]

The Louisiana First Circuit Court of Appeal thereafter denied petitioner's related

writ application without assigning reasons.[100] The Louisiana Supreme Court then

---

[99] Rec. Doc. 25, pp. 643-53.
[100] Rec. Doc. 25, p. 805; State v. Malbrough, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).

likewise denied relief, stating: "[A]pplicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[101]

For petitioner to be entitled to federal habeas relief with respect to this claim, he must establish that the foregoing state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For the following reasons, the undersigned finds that petitioner has not met his burden.

As noted, the state courts found that the reference to the bomb charge did not trigger a mandatory mistrial under Louisiana Code of Criminal Procedure article 770. Although petitioner urges this federal court to second-guess the state courts regarding that interpretation of state law, the Court cannot oblige. Issues of state law are the province of the state courts. *See, e.g., Levy Gardens Partners 2007, L.P. v. Commonwealth Land and Title Insurance Co.*, 706 F.3d 622, 629 (5th Cir. 2013) ("The principle that state courts are the final arbiters of state law is well-settled."); *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991) ("We will not review a state court's interpretation of its own law in a federal habeas corpus proceeding. We do not sit as a 'super' state supreme court in such a proceeding to review errors under state law." (internal citation and quotation marks omitted)). As a result, "errors of state law … are not cognizable in habeas corpus as such." *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992). Therefore, even if the state courts did in fact err in finding that a mistrial was not mandatory under state law, habeas relief still would not be

---

[101] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).

available unless that error was so egregious as to rise to the level of a federal constitutional violation. *See, e.g., Thomas v. Ieyoub*, No. 93-3757, 1994 WL 286198, at *2 (5th Cir. June 22, 1994) ("[E]rrors of state law, such as a denial of a mistrial, must rise to a constitutional dimension in order to merit habeas relief."); *Smith v. Whitley*, No. 93-03208, 1994 WL 83777, at *1 (5th Cir. Mar. 3, 1994) ("Even if the court's refusal to declare a mistrial was a violation of Louisiana law, we, as a federal habeas court, are without authority to correct a simple misapplication of state law; we may intervene only to correct errors of constitutional significance.").

Under the instant facts, there is no basis for finding that petitioner's federal constitutional rights were violated by the denial of the motion for mistrial. The United States Fifth Circuit Court of Appeals has held that the denial of such a motion

> justifies federal habeas corpus relief only if it was error so extreme that it constitutes a denial of fundamental fairness under the Due Process Clause. In order to obtain relief, [the petitioner] must show that the trial court's error had a substantial and injurious effect or influence in determining the jury's verdict. [The petitioner] must show that there is more than a mere reasonable possibility that [the error] contributed to the verdict. It must have had a substantial effect or influence in determining the verdict.

*Hernandez v. Dretke*, 125 F. App'x 528, 529 (5th Cir. 2005) (internal citations, quotation marks, and ellipsis omitted).

Petitioner cannot establish that the unexplained reference to a bomb charge had that effect. On the contrary, there is simply no reason to believe that the fleeting reference, which was not highlighted by questioning or in arguments, had **any** impact on the conviction, especially given the abundance of evidence establishing petitioner's guilt and the trial judge's instructions to the jurors that "[y]ou may not find the

81

defendant guilty because of these offenses merely because he may have committed

another offense in the past."[102]  Therefore, this claim should be denied.

### D. Unsigned Amended Indictment (Claim 9)

Petitioner next claims that his rights were violated when he was brought to

trial on an unsigned amended indictment.[103] In the state post-conviction proceedings,

the state district court denied that claim, holding:

> In assignment of error nine, the defendant complains that the grand jury indictment against him was improper because it was an unsigned amended indictment. Specifically, the defendant states as follows:
>
>> "The petitioner asserts that the state indicted him on a defective indictment in which they amended a year later. The amended indictment was not signed before petitioner was brought to trial …. Thus violating petitioner's due process. Petitioner was found guilty at trial and was fingerprinted on the face of the record which was an unsigned indictment."
>>
>> "Furthermore, the state provided the 1st Circuit Court of Appeal with an incomplete record because their failure to include the unsigned indictment in which petitioner was originally fingerprinted on."
>
> A review of the record in this case reveals that the defendant was originally indicted by the Terrebonne Parish Grand Jury on April 25, 2012, and charged with the four felonies for which he ultimately was convicted. The original indictment was signed by the grand jury foreperson. As pointed out above, the defendant had been charged with stalking by way of a bill of information filed February 2, 2012, in docket number 630340, but the prosecution in that matter ceased when the grand jury incorporated that charge into its indictment almost three months later. Then, almost exactly one year after the original indictment was filed, on April 24, 2013, the state filed an "Amended Indictment" charging the defendant for the same four offenses. This amended indictment was not signed by the grand jury foreperson, and

---

[102] Rec. Doc. 25, p. 1498.
[103] Rec. Doc. 5, p. 12.

the court assumes the matter was not presented to the grand jury for its consideration before the amended indictment was filed.

The only difference between the original indictment and the amended indictment is with regard to the second count of felony carnal knowledge of a juvenile, the only charge to which the defendant entered a plea of guilty. The original indictment alleged that the crime was committed "on or about in November of 2011." The amended indictment changed the phrase to "in or about November of 2001." Both documents allege that the victim was [A.V.], "a person who is thirteen years of age or older …." It appears that the documents should have said that [A.V.] "was" thirteen years of age or older at the time of the commission of the crime. In any event, the amendment of the original indictment was apparently intended to clarify that the crime was alleged to have occurred in November of 2001, not ten years later in November of 2011. The remaining three felony charges against the defendant, including the charge of aggravated rape, were unchanged by the amended indictment. After his convictions, the defendant's fingerprints were placed on the amended indictment, not the original indictment.

The thrust of this assignment of error by the defendant appears to be that his due process rights were violated by his convictions based an amended indictment not approved by the Terrebonne Parish Grand Jury.

Preliminarily, the court notes that the signature of the grand jury foreperson is an essential element of an indictment. Louisiana Code of Criminal Procedure article 383 declares that a grand jury indictment "must be signed by the foreman." The failure of the grand jury foreperson to sign the indictment is a special ground for a motion to quash pursuant to article 533(A)(5) of the Louisiana Code of Criminal Procedure. In this case, however, it is the <u>amended</u> indictment, not the original indictment, which is not signed by the grand jury foreperson, and as mentioned above, the court believes that the amended indictment is not the product of a grand jury proceeding. The crux of the issue presented by Mr. Malbrough is the extent to which a prosecution may be validly pursued when an original indictment is modified by the prosecutor without grand jury action.

In this case, the only amendment to the original indictment was with reference to the charge of felony carnal knowledge of a juvenile, a charge which does not require grand jury indictment, and the only charge to which the defendant entered a plea of guilty prior to trial on the remaining three charges. The charge of aggravated rape, which does

require a grand jury indictment pursuant to Louisiana Code of Criminal Procedure article 382(A), was not modified in any way by the amended indictment.

Under Louisiana Code of Criminal Procedure article 487, a prosecutor, prior to commencement of trial, may amend an indictment for any defects of form or substance, as long as the original indictment properly charges an offense. It is not necessary that new indictment be obtained from the grand jury. <u>State v. Pitree</u>, 930 So.2d 2656 (La. App. 3rd Cir., 2006), writ denied, 951 So.2d 1092 (La, 2007), reconsideration denied, 959 So.2d 485 (La., 2007), writ denied 951 So.2d 1093 (La., 2007), reconsideration denied 959 So.2d 485 (La., 2007). If a defendant is unduly prejudiced by any such amendment, his remedy is to seek a continuance of the trial.

The amended indictment in this case with regard to all counts for which the defendant proceeded to trial, is identical to the original indictment. As a result, the defendant can hardly complain that he was prejudiced by the amended indictment.

There is no constitutional right to grand jury action or approval of an amended indictment which otherwise conforms to Louisiana statutory requirements. The defendant's due process right to a fair trial was not violated in this case because of the amended indictment.

The defendant has also suggested by way of assignment of error number nine, that his due process rights were violated because the copy of the trial court record relied upon by the Louisiana First Circuit Court of Appeal did not include the unsigned indictment bearing the fingerprints of the defendant. A more detailed analysis of this portion of the defendant's claim is provided with regard to Assignment of Error No. 13, below.[104]

The Louisiana First Circuit Court of Appeal thereafter denied petitioner's related

writ application without assigning reasons.[105] The Louisiana Supreme Court then

---

[104] Rec. Doc. 25, pp. 653-56.
[105] Rec. Doc. 25, p. 805; *State v. Malbrough*, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).

likewise denied relief, stating: "[A]pplicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[106]

For petitioner to be entitled to federal habeas relief with respect to this claim, he must establish that the foregoing state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For the following reasons, the undersigned finds that petitioner has not met his burden.

It has long been held that "[t]he sufficiency of a state indictment is not a matter for federal habeas relief unless it can be shown that the indictment is so defective that it deprives the state court of jurisdiction." *McKay v. Collins*, 12 F.3d 66, 68 (5th Cir. 1994); *accord Wood v. Quarterman*, 503 F.3d 408, 412 (5th Cir. 2007). Moreover, "[w]here the state courts have held that an indictment is sufficient under state law, a federal court need not address that issue." *McKay*, 12 F.3d at 68; *accord Millard v. Lynaugh*, 810 F.2d 1403, 1407 (5th Cir. 1987).

As noted, petitioner challenged the sufficiency of the amended indictment on post-conviction review. The Louisiana Supreme Court denied relief based on his failure to meet his burden of proof under La. Code Crim. P. art. 930.2. In doing so, the Louisiana Supreme Court necessarily concluded, as did the lower courts, that the amended indictment was sufficient under Louisiana state law. That ends the matter. *See, e.g., Alexander v. McCotter*, 775 F.2d 595, 599 (5th Cir. 1985); *Lee v. Vannoy*, Civ. Action No. 19-12280, 2020 WL 3513743, at *12 (E.D. La. June 1, 2020), *adopted*, 2020

---

[106] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).

WL 3512709 (E.D. La. June 29, 2020); *Washington v. Tanner*, Civ. Action No. 13-6120, 2015 WL 13227943, at *13 (E.D. La. Dec. 11, 2015), *adopted*, 2016 WL 1253564 (E.D. La. Mar. 31, 2016); *Landor v. Cain*, Civ. Action No. 13-5515, 2014 WL 7342361, at *19 (E.D. La. Dec. 23, 2014). Accordingly, this claim should be denied.

## E. Perjured Testimony (Claim 10)

Petitioner claims that his constitutional rights were violated when the prosecution knowingly allowed its witnesses to commit perjury.[107] In the post-conviction proceedings, the state district court denied that claim, holding:

> The defendant's tenth assignment of error alleges that the state knowingly allowed perjured testimony to be presented by its witnesses. He cites the testimony of four witnesses in support of the allegation, i.e., the three juvenile victims, P.V., C.G., and A.V., as well as Detective Travis Theriot with the Houma Police Department. It is the defendant's position that each witness lied while under oath. However, the court's focus is on his allegation that the state knowingly allowed perjured testimony to be presented.

> According to the defendant, "The prosecutor not only allowed his witnesses to perjure themselves but instead of correcting them he tried covering it up with fast talk and changing the subject so the jury wouldn't catch it…." He points to multiple instances of alleged perjury by each of those four witnesses listed above, and claims the prosecutor's reactions to the testimony and/or method of presenting the same and/or other contradictory evidence supports the allegation that the prosecutor knowingly allowed the alleged perjured testimony to be presented.

> The state's knowing use of perjured testimony constitutes an egregious breach of its obligation to afford a defendant a fundamentally fair trial. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); State v. Allen, 2005 WL 1527624 (La., 2005). The standard for granting a new trial in the face of false testimony was stated by the United States Supreme Court in Agurs:

---

[107] Rec. Doc. 5, p. 13.

> "The rule of <u>Brady v. Maryland</u> … arguably applies in three quite different situations. Each involves the discovery, after trial of information which had been known to the prosecution but unknown to the defense. In the first situation … the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury …. [T]he court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."

This standard of materiality has been adopted by the Louisiana Supreme Court. <u>State v. Marshall</u>, 660 So.2d 819 (La., 1995).

The defendant has not pointed out to the court any direct evidence which establishes that the prosecutor knew or should have known than [sic] any of the witnesses called by the state were not telling the truth when they testified at the defendant's trial. The defendant merely relies on the prosecutor's "reactions to the testimony and/or method of presenting the same and/or other contradictory evidence" to support his suspicion that the prosecutor knowingly allowed perjured testimony to be presented. Even assuming for the sake of argument that the testimony of the four witnesses named by the defendant was untrue and material, it appears that the rules set forth by <u>Agurs</u> and its progeny do not apply because it is clear that all of the evidence upon which the defendant depends to support his allegations was evidence available to him at the time of the trial, and not hidden from him by the state.

As pointed out hereinabove, C.G., the alleged victim of stalking by the defendant, testified on the second day of trial. During her testimony, the state played for the jury a videotaped statement she gave Detective Travis Theriot, on December 16, 2011, the day the crime was alleged to have occurred. <u>Trial Transcript</u>, June 11, 2013, pp. 164-167. Detective Theriot testified the same day. The court has reviewed the videotape and the testimony of C.G. and Detective Theriot given in court. C.G. was twelve years old at the time of trial, and ten years old at the time she gave her statement.

With regard to the trial testimony of C.G. and Detective Travis Theriot, the defendant alleges:

"The alleged victim of the stalking charge gave a completely different account of what actually happened. When she gave her initial statement to the police she said petitioner passed in front of her bus stop several times on Wednesday when in fact she was not even at the bus stop on Wednesday which her brother later testified to and confirmed. (See trial trans. pgs. 405-408, 583 and original interview.)"

\*\*\*

"The state had Detective Travis Theriot take the stand and he testified to getting petitioner's license plate number from the alleged stalking victim's bus driver, Malika McKinley, (see trial trans. pg. 397 ln. 18-29) after which Ms. McKinley got on the stand and said she did not give detectives petitioner's license plate number. (see trial trans. pg. 411 ln. 27-32, pg. 412 ln. 1). She also testified saying that the note petitioner gave the alleged stalking victim was larger than the one presented at trial, (see trial trans. pg. 410 ln. 28-32, pg. 411 ln. 1-14) after detective Travis Theriot already said it wasn't larger and the principal of the school, Ms. Melanie Robert, also testified to the size of the note as being the same as the note presented at trial."

\*\*\*

"…petitioner avers that the only thing that all the state's witnesses did agree upon was so blatantly obviously coached that the note was 'extremely alarming' to them. Several witnesses agreed to the exact same phrase."

In her videotaped interview, C.G. reported that on Wednesday, two days before the defendant's arrest, while she was at the bus stop, the defendant "passed six or seven – he would – the days would double, not double, get higher as he – everything." In context her meaning was clear, i.e., that she observed the defendant pass her bus stop more and more each day, beginning Monday of that week, and that she saw him pass six or seven times on Wednesday while she was at the bus stop. At trial, she was not asked any questions by the prosecutor or defense counsel about the defendant passing by the bus stop at all. She was merely asked about the events that occurred on Friday of that week, when the defendant is alleged to have handed her a note, and she merely

responded, "Yes, sir," when asked by the prosecutor if everything she told Detective Theriot was true.

When C.G.'s twelve year old brother, Jeremy Wilson, was called to testify by the state in rebuttal to the case presented by the defense, he testified that in December, 2011, he was waiting at the same bus stop as his sister when the defendant passed, and that at no time between Monday and Thursday did his sister approach the defendant's vehicle so she could see his dog. On cross-examination by defense counsel, he admitted he had previously told an officer with the Houma Police Department that his sister was not at the bus stop on Wednesday of that week. Trial Transcript, June 12, 2013, pp. 162-164.

When he testified in his own defense, Mr. Malbrough claimed that C.G. was not at the bus stop on Wednesday, but that her brother was present. Trial Transcript, June 12, 2013, p. 126, lines 26-30.

None of the foregoing supports the allegation that the prosecutor knew or should have known that C.G. committed perjury when she testified under oath in court that her videotaped statement was a true account of what happened at the bus stop in December, 2011. At trial, she did not contradict any information she had previously given during her videotaped statement. It was her brother who, on cross examination, contradicted his own direct testimony regarding her presence at the best stop on Wednesday. There is no allegation that the defense was impeded in any way from discovering that the brother might have been a witness and might have had information about the possible absence of his sister from the bus stop on Wednesday. In fact, apparently, the defense had the brother's pre-trial statement to the Houma Police Department and effectively conveyed to the jury the possibility that C.G. was not at the bus stop on Wednesday, despite her representations to the contrary.

The defendant also alleges the state knew or should have known that Detective Theriot was lying about the fact that he obtained the defendant's license plate number on December 16, 2011, from C.G.'s bus driver, Malika McKinley. According to the trial transcript, Detective Theriot testified that he never spoke to the bus driver, and that he obtained the defendant's license plate number from the school principal, Melanie Robert. He said that the bus driver had provided information to the Houma Police Department "through the principal." Trial Transcript, p. 120, lines 22-26.

When she testified, Malika McKinley, the bus driver, said she never obtained the defendant's license plate number. Trial Transcript, June

11, 2013, p. 170, line 27, through p. 171, line 1. At trial, the school principal, Melanie Robert, a/k/a Melanie Robert Wallis, was not asked by counsel for the state or the defendant if she had obtained the license plate number of the defendant, much less where she obtained it, and to whom she had given it. Trial Transcript, p. 173-175. The defendant has not directed the court to any evidence that contradicts the testimony of Detective Theriot.

The defendant also raised a perjury issue in connection with the receipt into evidence of the note C.G. allegedly received from the defendant. When he testified, Detective Theriot stated that he viewed the note which was in the possession of a Houma Police Department officer, Dex Martin, and that after he viewed the same, it remained in the possession of that officer until it was placed in evidence at the Houma Police Department. It is clear from his testimony that he did not receive the note from the school principal. Trial Transcript, June 11, 2013, p. 121, lines 9-27. He identified the note offered as evidence at trial as the same note he had previously viewed. It was admitted into evidence as state exhibit S-3. He did not offer any specific testimony about the size of the note.

The school principal, Ms. Robert, a/k/a Ms. Wallis, testified in the affirmative when she was asked by the prosecutor if she had "provided" Detective Theriot with the note. She viewed the note in open court and identified it as the one she received from the bus driver, Ms. McKinley. She, too, did not offer any specific testimony about the size of the note.

When she testified, Ms. McKinley admitted that she delivered to the school principal the note given to her by C.G. She initially identified state exhibit S-3 as the note she had received. Later, however, she indicated that she thought the note she had received was "bigger" than the note she viewed and identified in open court. She testified that the note was torn at the bottom when she received it from C.G.

At his trial, the defendant admitted he gave C.G. a note. His exact response to a question posed by the prosecutor was, "No, the note was intact when I handed it to her." Trial Transcript, June 12, 2013, p. 147, line 7.

Based on the foregoing testimony of Detective Theriot, Ms. Robert, a/k/a Ms. Wallis, Ms. McKinley, and himself, the defendant appears to suggest that the note received into evidence was not the same note, or not the entirety of the note, allegedly given by him to C.G. and that the

state encouraged perjury by Detective Theriot and/or Ms. Robert a/k/a Ms. Wallis, and perhaps, Ms. McKinley.

The court fails to understand why the defendant thinks the evidence recited above suggests the state knew or should have known that any of the witnesses were not being truthful. The defendant has not pointed to any evidence which existed at the time of trial that was not available to him or counsel and which could have been used to establish the lack of truthfulness by any of these witnesses. As a result, he cannot and has not established that the state knowingly offered perjured testimony in violation of his constitutional rights. Detective Theriot or [sic]

The defendant has also alleged that it is suspicious that the witnesses used the same term, i.e., "extremely alarming," in describing their reaction to the note he gave C.G. He suggests the state's witnesses were coached in their testimony, and that this is evidence that the state condoned perjury in this case.

The court has reviewed the trial testimony of the bus driver and school principal. It was the prosecutor who used the words "alarmed" or "alarming" each time he questioned the witnesses regarding the note. The witnesses merely confirmed his description of their reaction.

The bus driver was asked twice if she found the note alarming. The first time she replied that she was "very concerned." Trial Transcript, June 11, 2013, p. 169, lines 23-25. The second time, when asked if she was alarmed, she responded, "Oh, yeah." Trial Transcript, June 11, 2013, p. 170, lines 15-16. When she was asked if the school principal looked alarmed when she received the note from her, she replied, "Yes." Trial Transcript, June 11, 2013, p. 170, lines 24-26. The bus driver never used the words "alarmed" or "alarming."

The school principal was asked by the prosecutor if the note was alarming to her. She replied, "Extremely alarming." Trial Transcript, June 11, 2013, p. 173, lines 30-32. When asked if it was extremely alarming to her as a parent, she responded, "Yes." Trial Transcript, June 11, 2013, p. 174, lines 1-2. When asked by the prosecutor if she expressed her alarm to Detective Theriot, she said, "Yes-very, very alarming." Trial Transcript, June 11, 2013, p. 174, lines 14-16.

There was no consistency in exactly the manner in which the witnesses responded to the prosecutor's questions suggesting alarm. The evidence pointed out by the defendant does not support his allegation of coaching,

much less his allegation that any such coaching is evidence that the state condoned perjury by its witnesses in this case.

In connection with his tenth assignment of error, the defendant also makes the following allegation with regard to the testimony of P.V., who was the victim of sexual battery:

> "The prosecutor not only allowed his witnesses to perjure themselves but instead of correcting them he tried covering it up with fast talk and changing the subject so the jury wouldn't catch it and in one instance asked his witness [P.V.], one of the alleged victims, if the reason her testimony of what happened differed from her initial report to the police was because she gave more details this time. When in fact, her two (2) accounts of what happened were completely different not more detailed. She first reported that petitioner touched her "on" her underwear in "2003." The she testified that petitioner touched her "under" her underwear in "2004." Then when asked by the district attorney if the account she gave was true she responded "which one?" (See trial trans. pgs. 432-33.)"

The court has reviewed the testimony of P.V. <u>Trial Transcript</u>, June 12, 2013, pp. 8-14. No documentary evidence of any kind was introduced by the state in connection with her testimony. At the time of trial, she was twenty years of age. The sexual battery against her was alleged to have occurred "on or about 2003," some ten years prior to trial. Based her date of birth of January 30, 1993, she would not have been greater than ten years of age at any time in 2003.

P.V. testified that one night, when she was eleven years old, she slept in her bed at her house with the defendant and his girlfriend, Lindsey Sand, who was her babysitter. The next morning, after Lindsey got up, the defendant touched her inappropriately. The testimony was as follows:

> "Q.    Okay, now when you said he was touching you, I have to ask you specifically, where was he touching you?
>
> A.    I was like facing to my left side, and he had his left hand around my underwear and he was like touching-I don't know what y'all want to call it, I guess, vagina.
>
> Q.    Okay, --

> A.    Like he was touching me right there. And then I could feel like his fingers trying to go inside the hole, in my underwear and then like around my underwear.
>
> Q.    Okay so did he touch you-let's just say your private part, with his hand?
>
> A.    Yes.
>
> Q.    And was it skin on skin touch down there?
>
> A.    Yes.
>
> Q.    Underneath the underwear?
>
> A.    Yes."
>
> Trial Transcript, June 12, 2013, p. 10, lines 11-26.

On cross-examination, P.V. confirmed that the incident occurred in 2004. She admitted that she had earlier claimed in an out-of-court statement that the incident occurred in 2003, but she explained that since then she had time to remember other events in her life that caused her to believe the correct year was 2004. When defense counsel confronted her with a statement she had made to the Houma Police Department in 2012, she admitted that she had indicated to police at the time that the defendant had begun to rub her on the outside of her panties and that she did not say there was any skin to skin contact. When challenged that she had changed her story, she replied, "No, I just didn't-I guess say the full thing." Trial Transcript, June 12, 2013, p. 13, line 22. She then admitted that she recalled saying in her original statement that the touch was over her clothes and that when it happened she got up and went to another room.

On redirect examination, she confirmed her trial testimony. The defendant's complaint centers on the following exchange between her and the prosecutor:

> "Q.    [P], in this case, back when you were 11, as you described the details of what happened; did you describe those details to us a little bit more than you were describing in the statement you gave to the police?

> A.    Yes.
>
> Q.    Okay, and in fact, in the statement you gave us this morning, is it true?
>
> A.    Which one?
>
> Q.    This morning, what you told us today?
>
> A.    Yes."

The foregoing testimony cited by the defendant does not support his allegation that the state offered evidence which it knew or should have known was perjured testimony. Defense counsel apparently had in his possession the information necessary to point out to the jury that the witness had made a prior statement in 2012 which might be viewed as inconsistent with her trial testimony. No other evidence available to the state, but not to the defendant, at the time of the trial, has been furnished to this court by the defendant and which points to any effort on the part of the state to elicit false testimony from the witness. For this reason, no relief can be granted with regard to the defendant's claim that the state knew or should have known that P.V. testified falsely at his trial.

The defendant's final complaint with regard to this assignment of error centers on the testimony of A.V., the alleged victim of aggravated rape. According to the defendant:

> "The testimony of the alleged victim of the aggravated rape was completely coerced and in order to help her remember what she was supposed to say the prosecutor played the video tape of her forensic interview for her while she was in court before she testified and all that was asked of her in court was if what she said on the video was true. (See trial trans. pgs. 473-482."

The defendant's position appears to take exception to the following sequence of events at his trial, confirmed by the court's review of the record. On the third day of trial, June 12, 2013, the state presented testimony from its witness, Nicole Voisin, a detective with the Houma Police Department, who spoke to the alleged victim of the aggravated rape, A.V., the defendant's biological daughter, on January 9, 2012, when she was nine years old. Based on the limited information the child furnished to her, she brought A.V. to the Children's Advocacy Center to

be interviewed by Dawn Buquet on that same day. During Detective Voisin's time on the witness stand, the videotape of that interview, identified as state exhibit S-2, was played for the jury.

The state then announced its intention to call A.V., who was ten years old, as a witness, and indicated that it would play a second videotape of an interview of A.V. by Ms. Buquet, on March 8, 2012. The state indicated that it intended to play the videotape for the jury before it asked the witness any substantive questions about the matters discussed with her during the interview. Defense counsel objected on the grounds that videotape would amount to leading of the witness if it was played before she was asked questions. Defense counsel did not object to the playing of the videotape, but did object to playing it in the presence of the witness before substantive questions were asked of her. The court overruled the defendant's objection and permitted the child to remain in the courtroom while the videotape, identified as state exhibit S-1, was played for the jury.

After the videotape ended, A.V. was asked by the prosecutor if she was telling the interviewer the truth and she responded, "Yes, sir." She then confirmed that between her first interview on January 9, 2012, and her second interview on March 8, 2012, the first person she told that her "daddy put his private part" in her mouth, was a counselor, Dana Davis. Thereafter, no further questioning of the child took place inasmuch as the defendant's attorney declined to cross-examine her.

La. R.S. 15:440.5 governs the admissibility into evidence of videotapes of the kind offered by the state as state exhibit S-1 at the defendant's trial. Under La. R.S. 15:440.4, such a videotape is admissible "as an exception to the hearsay rule." The child, or "protected person" whose interview is depicted on the videotape need not be called as a witness by the state, but must be "available to testify." Part B of La. R.S. 15:440.5 specifically provides that nothing in the statute "shall be construed to prohibit the defendant's right of confrontation."

The presence of protected person in court at the time a videotaped interview is admitted into evidence and played for a jury pursuant to La. R.S. 15:440.5 is not a violation of any constitutional right to confrontation. Louisiana Code of Evidence article 615, dealing with the sequestration of witnesses, specifically provides that the victim of an offense may not be barred from the courtroom under authority of that article. There is no constitutional right of a defendant to require that any witness be barred from the courtroom, or that a witness, who he has a right to confront, must remain outside the courtroom.

> The defendant's argument, however, is directed to his claim that the prosecutor's decision to have A.V. present in the courtroom where she could hear and see the videotaped evidence before questioning, somehow means that the prosecutor violated his right to a fair trial because it was part of the state's strategy to suborn perjury by the witness. The facts pointed out to the court by the defendant in connection with the testimony of A.V., simply do not support his claim.[108]

The Louisiana First Circuit Court of Appeal thereafter denied petitioner's related writ application without assigning reasons.[109] The Louisiana Supreme Court then likewise denied relief, stating: "[A]pplicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[110]

For petitioner to be entitled to federal habeas relief with respect to this claim, he must establish that the foregoing state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For the following reasons, the undersigned finds that petitioner has not met his burden.

Regarding claims of the use of perjured testimony, the United States Fifth Circuit Court of Appeals has explained:

> The Supreme Court has repeatedly held that "a conviction obtained through false evidence, known to be such by representatives of the State" violates a defendant's constitutional rights. *See Miller v. Pate*, 386 U.S. 1, 7, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (citing cases). A violation occurs where there is a "deliberate deception of court and jury by the presentation of testimony known to be perjured." *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). "The same result obtains when the State, although not soliciting false evidence, allows it

---

[108] Rec. Doc. 25, pp. 656-66.

[109] Rec. Doc. 25, p. 805; *State v. Malbrough*, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).

[110] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).

> to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269,
> 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). To obtain relief, [a petitioner] must
> show "1) the testimony was actually false, 2) the state knew it was false,
> and 3) the testimony was material." *Pyles v. Johnson*, 136 F.3d 986, 996
> (5th Cir. 1998) (internal quotation marks and citations omitted). The
> testimony is material if "there is any reasonable likelihood that the false
> testimony could have affected the judgment of the jury." *United States
> v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (citing
> *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104
> (1972)).

*Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014).

Here, however, it is unnecessary to engage in an analysis concerning the extent
to which the foregoing three prerequisites have been met because petitioner's claim
fails for a more fundamental reason. Specifically, as the state district court correctly
noted in its opinion, "all of the evidence upon which the defendant depends to support
his allegations was evidence available to him at the time of the trial, and not hidden
from him by the state."[111] That fact, in and of itself, dooms his claim.

The United States Fifth Circuit Court of Appeal has explained: "'[T]here is no
violation of due process resulting from prosecutorial non-disclosure of false testimony
if defense counsel is aware of it and fails to object.'" *Beltran v. Cockrell*, 294 F.3d 730,
736 (5th Cir. 2002) (quoting *DeMarco v. United States*, 928 F.2d 1074, 1076 (11th Cir.
1991)). "'When a criminal defendant, during his trial, has reason to believe that
perjured testimony was employed by the prosecution, he must impeach the testimony
at the trial ....'" *Id.* (quoting *Evans v. United States*, 408 F.2d 369, 370 (7th Cir. 1969)).
The issue must be raised "'then or not at all.'" *Id.* (quoting *Evans*, 408 F.2d at 370).

---

[111] Rec. Doc. 25, p. 657.

In the instant case, at the time of trial, defense counsel was aware of all the evidence to which petitioner points, but counsel nevertheless opted not use that evidence to try to impeach the witnesses on cross-examination at trial. As a result, petitioner cannot now point to that very same evidence to support his claim in this federal proceeding. *See, e.g., Dinh Tan Ho v. Thaler*, 495 F. App'x 488, 494-95 (5th Cir. 2012); *Eaglin v. Louisiana*, Civil Action No. 19-9659, 2020 WL 475770, at *29 (E.D. La. Jan. 1, 2020), *adopted*, 2020 WL 474923 (E.D. La. Jan. 29, 2020), *certificate of appealability denied*, No. 20-30081, 2020 WL 4592908 (5th Cir. Aug. 6, 2020); *United States v. Bujilici*, Crim. Action No. 12-00231, 2014 WL 2112858, at *7 (W.D. La. May 19, 2014).

## F. Petitioner Not Allowed to View State's Evidence (Claim 11)

Petitioner next claims that his rights were violated because he was not allowed to view all evidence against him.[112] In the state post-conviction proceedings, the state district court denied that claim, holding:

> The defendant's eleventh assignment of error is based on his allegation that the state did not allow the defendant to view all of the state's evidence against him before trial. His elaboration of this complaint in his post conviction relief application refers to the same circumstances upon which assignment of error number five, discussed hereinabove, is based. He alleges that his constitutional rights to due process were violated because the state did not allow him to view, before trial, a videotaped interview of the stalking victim, C.G.

> As explained hereinabove, the court believes that it is more likely than not that Mr. Thomas did, in fact, view Exhibit S-5 prior to trial. For that reason, it cannot be said that the state did not allow him to do so. If Mr. Malbrough did not see the evidence, that is of no consequence inasmuch as his attorney did see the evidence.

---

[112] Rec. Doc. 5, p. 14.

For these reasons, the court finds that this assignment of error is without merit.[113]

The Louisiana First Circuit Court of Appeal thereafter denied petitioner's related writ application without assigning reasons.[114] The Louisiana Supreme Court then likewise denied relief, stating: "[A]pplicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[115]

For petitioner to be entitled to federal habeas relief with respect to this claim, he must establish that the foregoing state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For the following reasons, the undersigned finds that petitioner has not met his burden.

Here, the crux of petitioner's claim is that the defense was not allowed to view all evidence against him, purportedly in violation of La. Rev. Stat. Ann. § 15:440.5(A)(7),[116] which provides: "The videotape of an oral statement of the protected person made before the proceeding begins may be admissible into evidence if … The defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence …." As already explained herein, the state courts found that there was no violation of that state statute in this case.

---

[113] Rec. Doc. 25, pp. 666-67.
[114] Rec. Doc. 25, p. 805; *State v. Malbrough*, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).
[115] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).
[116] Rec. Doc. 5-2, p. 39.

In any event, this Court need not reach the issue of whether the prosecution violated its discovery obligations under § 15:440.5(A)(7) because, without more, mere discovery violations under state law cannot serve a basis for federal relief. The rule is clear: Because there is no general federal constitutional right to discovery in a criminal case, a claim that a prosecutor violated state discovery rules simply is not cognizable on federal habeas review. *See, e.g., Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002); *Lande v. Cooper*, Civ. Action No. 11-3130, 2013 WL 5781691, at *16 (E.D. La. Oct. 25, 2013); *Smith v. Travis*, Civ. Action No. 08-4627, 2009 WL 1704335, at * 10 (E.D. La. June 16, 2009); *Burns v. Lafler*, 328 F. Supp. 2d 711, 723 (E.D. Mich. 2004).

## G. Introduction of Video Evidence (Claim 12)

Petitioner also claims that his rights were violated when the prosecution "introduce[ed] video evidence petitioner had not previously seen violating La.R.S. 15:440.5(A)(7)."[117] In the state post-conviction proceedings, the state district court denied that claim, holding:

> By way of assignment of error number twelve, the defendant reiterates the factual allegations made by him in connection with assignment of error number five and assignment of error number eleven, but extends his claim to say that his constitutional rights to due process were violated because the videotaped interview to which he claim he was denied access before trial, was actually introduced as evidence against him by the state at the trial itself. He contends that the offer of the videotape and admission of the same into evidence violated the dictates of La. R.S. 15:440.5(A)(7) because neither he nor his attorney had viewed the evidence before trial.

---

[117] Rec. Doc. 5, p. 15.

In this assignment of error, the defendant has not suggested that evidence of the taped interview was inadmissible for any reason other than neither he nor his attorney had seen the video.

As explained hereinabove, the court is not convinced that Mr. Thomas did not view the videotaped statement of C.G. before it was admitted into evidence. The court is even less convinced that the videotape was not made available to him prior to trial, whether he viewed it or not. Even if he failed to view it, that fact alone would not have prevented its lawful introduction into evidence under La. R.S. 15:440.5(A)(7), because it was available for viewing. No relief will be granted with regard to this assignment of error by the defendant.[118]

The Louisiana First Circuit Court of Appeal thereafter denied petitioner's related writ application without assigning reasons.[119] The Louisiana Supreme Court then likewise denied relief, stating: "[A]pplicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[120]

For petitioner to be entitled to federal habeas relief with respect to this claim, he must establish that the foregoing state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For the following reasons, the undersigned finds that petitioner has not met his burden.

This claim is yet another variation of petitioner's contention that there was a violation of La. Rev. Stat. Ann. § 15:440.5(A)(7). As already noted, the state courts found that the state statute was not violated in this case. And, again, although petitioner is now attempting to challenge the correctness of the state court's

---

[118] Rec. Doc. 25, pp. 667-68.
[119] Rec. Doc. 25, p. 805; *State v. Malbrough*, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).
[120] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).

evidentiary ruling admitting the video into evidence, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions such as the admissibility of evidence under state procedural rules." *Goodrum v. Quarterman*, 547 U.S. 249, 261 (5th Cir. 2008) (quotation marks omitted). Rather, in a federal habeas proceeding, "[t]he evidentiary rulings of a state court will only be overridden when there is error so extreme that it constituted denial of fundamental fairness." *Prystash v. Director*, 854 F.3d 830, 840 (5th Cir. 2017) (quotation marks omitted); *accord Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005) ("A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious such that it renders the petitioner's trial fundamentally unfair.").

Here, even if petitioner could show that the video evidence was in fact improperly admitted, which is doubtful for the reasons noted by the state courts, federal habeas relief still would not be warranted. The video evidence at issue was a video of C.G.'s statement to Detective Theriot. However, it must be remembered that C.G. herself also testified **in person at trial**.[121] After she watched the video as it was played for the jury, she testified that what she had said in the video was true:

Q.   What you told Detective Theriot; was that true?

A.   Yes, sir.

Q.   And that's pretty much what you know about what happened in regards to you in this case?

---

[121] Rec. Doc. 25, pp. 1279-82.

A.    Yes, sir.[122]

The video was obviously employed in this manner to allow C.G., an eleven-year-old girl, to explain at trial how she had been victimized without her having to recount the details herself in front of the jury. However, **if** the video had been excluded as petitioner now suggests should have occurred, then there is no reason to believe that C.G., who testified under oath that what she said happened in the video was true, would not have simply testified in conformity with that statement upon being questioned at trial. Therefore, the end result here would have been the same, and so petitioner's right to a fair trial was in no way infringed simply because this alternative method was employed to relate C.G.'s version of events to the jury.

## H. Incomplete Appellate Record (Claim 13)

Petitioner next claims that his rights under both federal and state law were violated when the Louisiana First Circuit Court of Appeal "render[ed] a judgment without a complete record."[123] In the state post-conviction proceedings, the state district court denied that claim, holding:

> In his final assignment of error, the defendant alleges that he was denied his constitutional right to due process because the Louisiana First Circuit Court of Appeal rendered a decision without considering a complete record contrary to Article I, Section 19 of the Louisiana Constitution. This assignment of error is based, in part, on the defendant's claim reflected by Assignment of Error No. 9, discussed hereinabove, i.e., that he was brought to trial on an amended indictment not signed by or approved by the Terrebonne Parish Grand Jury. The present assignment of error is also based on allegations by the defendant that the trial transcript furnished to the appellate court "was not complete and was full of errors." Specifically, he claims:

---

[122] Rec. Doc. 25, p. 1281.
[123] Rec. Doc. 5, p. 16.

"There were several items/statements missing all together and other items/statements were transcribed incorrectly. Thus forcing the reviewing court to render a judgment based on an incomplete record. See trial transcript page 478 line 26 the date is wrong it should be July 26, 2002, page 541 line 7 address is wrong it should be 118 Judith Street, page 559 line 21-25 petitioner's response to line 21 was omitted, petitioner told the district attorney that was his opinion before Mr. Thomas objected therefore making it a part of the record. Now petitioner knows these few mistakes or ommissions [sic] are only minor but it makes petitioner wonder what else has been ommitted [sic] and/or transcribed incorrectly."

The state in its response to the defendant's post conviction relief application, argues that there is no authority for the defendant to pursue this assignment of error because Louisiana Code of Criminal Procedure 930.3 does not provide for post conviction relief for a claim of an improper result by an appellate court, even if that result rests on an incomplete record from the trial court. The court disagrees. Because the record of the trial court proceedings dictates the actions of both appellate counsel and the appellate court, it is essential that the record furnished to them be complete and accurate. Thus, reliance by both appellate counsel and the appellate court on an incomplete or inaccurate record implicates the due process rights of the defendant for which he is afforded a post conviction remedy pursuant to Louisiana Code of Criminal Procedure article 930.3(1).

Section 19, Article I of the Louisiana Constitution, cited by the defendant, provides in pertinent part as follows:

"No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based on a complete record of all evidence upon which the judgment is based…."

It is important to understand that this constitutional provision refers to a complete record of all <u>evidence</u>, which would naturally include evidence of the testimony of witnesses made available to the appellate court by way of a transcript of the recorded proceedings.

It appears that this constitutional provision does not expressly apply to pleadings, such as an original indictment or amended indictment, which

104

are not evidence. In any event, the defendant is not entitled to post conviction relief based on this assignment of error insofar as it applies to his allegation that the amended indictment in this case was not signed by the grand jury foreperson or otherwise obtained by direct grand jury action. As explained hereinabove, constitutional due process does not require new grand jury approval for an amended indictment like the one in this case. Further, the defendant's right to appellate review was not compromised by any failure of the grand jury to act. The appellate court had copies both the original and amended indictments, and those documents were identical with regard to the charges for which the defendant proceeded to trial and for which he was convicted. There was absolutely no prejudice suffered by him at the appellate level because of any failure of the grand jury to approve the amended indictment.

The defendant also alleges his right to appellate review was compromised because the transcript of trial testimony furnished to the appellate court contained errors and/or omissions, thus rendering the record in this case "incomplete." He points to three alleged deficiencies in the transcript:

> (1) On the third day of trial, June 12, 2013, during the direct examination of A.V., the defendant's daughter and the alleged victim of the aggravated rape, she was asked her age. She stated she was ten years old. The transcript indicate she replied, "July 26, 2010," when asked her date of birth. The defendant claims the transcript is inaccurate because the child's correct date of birth is July 26, 2002, which would have made her ten years old on the day she testified. At the post conviction relief hearing in this matter, the state agreed that the transcript was inaccurate.

> Trial Transcript, June 12, 2013, page 59, lines 23-26.

> (2) Again, on the third day of trial, June 12, 2013, during the direct examination of the defendant by his counsel, he was asked where he was living when the stalking charge against him was alleged to have occurred. The defendant claims he responded "118 Judith Street." The transcript indicates his response was "188 Judith Street."

> Trial Transcript, June 12, 2013, page 122, lines 5-7.

105

(3) Finally, again on the third day of trial, June 12, 2013, during the state's cross-examination of the defendant, the prosecutor suggested the defendant was a "master manipulator." The defendant claims he immediately responded to the allegation by telling the prosecutor that that was his opinion. The defendant's attorney then objected to the state's description of the defendant and the court agreed. The transcript does not reveal any statement by the defendant to the prosecutor before his attorney's objection.

Trial Transcript, June 12, 2013, page 140, lines 21-25.

The defendant admits that these inaccuracies in the transcript "are only minor," but he correctly suggests that such errors could cause one to reasonably question the accuracy of other, more important portions of the transcript. However, despite his obviously thorough review of the transcript, he has not pointed out to the court any other questionable parts of the transcript. Neither has he explained how he was, in fact, prejudiced by any of the errors he has pointed out.

While material omissions from a transcript of the proceedings at trial require reversal of a conviction, slight inaccuracies which do not prejudice the defendant's appeal do not justify post conviction relief. State v. Pernell, supra.

The court has examined the alleged transcript errors cited by the defendant. None of the errors are material, i.e., they did not adversely affect his right to access the full scope of appellate review. Because of this lack of prejudice, he is not entitled to post conviction relief based on the transcript mistakes upon which he relies for relief.[124]

The Louisiana First Circuit Court of Appeal thereafter denied petitioner's related

writ application without assigning reasons.[125] The Louisiana Supreme Court then

---

[124] Rec. Doc. 25, pp. 668-70.
[125] Rec. Doc. 25, p. 805; State v. Malbrough, No. 2017 KW 1247, 2017 WL 5952334 (La. App. 1st Cir. Nov. 30, 2017).

likewise denied relief, stating: "[A]pplicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[126]

For petitioner to be entitled to federal habeas relief with respect to this claim, he must establish that the foregoing state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For the following reasons, the undersigned finds that petitioner has not met his burden.

As an initial matter, petitioner argues in part that the defects in the appellate record denied rights guaranteed to him by the Louisiana Constitution.[127] However, again, this Court cannot grant relief for violations of state law. As the United States Supreme Court has explained:

> The habeas statute "unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, [562 U.S. 1,] 5, 131 S.Ct. 13, 15, 178 L.Ed.2d 276 (*per curiam*) (quoting 28 U.S.C. § 2254(a)). "We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990)).

*Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). Therefore, state law claims concerning a purportedly inadequate appellate record are not cognizable in a federal habeas proceeding. *See, e.g., Hano v. Warden, Louisiana Correctional Institution for Women*,

---

[126] Rec. Doc. 25, pp. 918-20; *State v. Malbrough*, 265 So. 3d 763 (La. 2019).
[127] *See* Rec. Doc. 5, p. 16; Rec. Doc. 5-2, p. 40.

Civ. Action No. 09-7741, 2011 WL 3320660, at *23 (E.D. La. July 6, 2011), *adopted*, 2011 WL 3320595 (E.D. La. Aug. 1, 2011).

Of course, to the extent that petitioner is also claiming that his rights under federal law were violated, that portion of his claim is cognizable. However, for the following reasons, it is meritless.

The United States Fifth Circuit Court of Appeals has explained:

> The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. Accordingly, if a State has created appellate courts as an integral part of the system for finally adjudicating the guilt or innocence of a defendant, the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution. However, a complete verbatim transcript is not always required to ensure that a defendant's right to meaningful appellate review is satisfied. Accordingly, the record is adequate for full appellate review so long as it contains the portions **necessary to address the alleged errors below**. Moreover, claims based on incomplete transcripts must show that the absence of such a transcript prejudiced the defendant's appeal.

*Higginbotham v. Louisiana*, 817 F.3d 217, 222 (5th Cir. 2016) (emphasis added; citations, quotation marks, and ellipsis omitted). In other words, to have a viable claim regarding a purportedly incomplete transcript, a petitioner must show that the missing portions were germane to **the claims he asserted in his appeal**. *See Kunkle v. Dretke*, 352 F.3d 980, 985 (5th Cir. 2003) ("[A] State need not waste its funds providing for free those parts of the transcript that are not 'germane to consideration of the appeal.'" (quoting *Draper v. Washington*, 372 U.S. 487, 495 (1963)); *Schwander v. Blackburn*, 750 F.2d 494, 497-98 (5th Cir. 1985); *Coleman v. Cain*, Civ. Action No. 07-3655, 2014 WL 348541, at *20-21 (E.D. La. Jan. 3, 2014).

Here, petitioner does not allege, much less establish, that any of the missing portions of the record or the purported errors in the transcripts were relevant to – and necessary for full review of – the **sole** claim asserted on direct appeal, namely, that the trial court improperly denied his request for severance of the counts in the amended indictment. Accordingly, he has not established that his rights under federal law were violated.

## I. Victim Recantation (Claim 14)

Lastly, petitioner claims that "his right to a fair trial was violated due to newly discovered evidence where prosecutor's key witness recanted her trial testimony."[128] In the state post-conviction proceedings, the state district court denied that claim, holding:

> [T]he defendant filed a second petition for post conviction relief and alleged only one ground in support thereof, to wit, that the victim of the aggravated rape, A.V., recanted her trial testimony in two letters she wrote dated September 25, 2016, and April 6, 2017. According to the defendant, in both letters the victim alleges the defendant is factually innocent. The defendant seeks a reversal of his conviction for aggravated rape, a new trial on the charge, and all other appropriate relief.
>
> In response to the defendant's second post conviction relief application, the state urged its dismissal without a hearing, alleging that claims of actual innocence are not cognizable on collateral review in the absence of a corresponding violation of a constitutional right. The court denied the state's motion after a hearing with regard to the same on July 11, 2018. Thereafter, on September 21, 2022, the court conducted an evidentiary hearing to consider the merits of the defendant's second post conviction relief application.
>
> The court has reviewed the allegations of the defendant in his application for post conviction relief, the answer of the state thereto, the entire record of the proceedings in this court, and the evidence adduced

---

[128] Rec. Doc. 5, p. 17.

at the hearing on September 21, 2022. For the following reasons, the court has entered judgment dismissing the defendant's second post-conviction relief application and denying all relief.

Article 930.8 of the Louisiana Code of Criminal Procedure presently provides that no application for post conviction relief shall be considered if it is filed more than two (2) years after the judgment of conviction and sentence has become final, subject to certain exceptions. Prior to legislative amendment of this article in 1999, defendants were permitted to file such applications for consideration within three (3) years after judgment of conviction and sentence became final, or by October 1, 1991, whichever occurred later, unless certain statutory exceptions applied to extend the deadline.

In this case, the defendant's conviction and sentence became final on April 25, 2014. Under article 930.8(A) as it existed at the time, the deadline for the filing of a post-conviction relief application by the defendant in this case was April 25, 2016.

The defendant's second post conviction relief application was filed June 26, 2017, more than one year after the April 25, 2016, deadline. As a result, the application should be dismissed under article 930.8(A) unless one of the exceptions provided by the article applies. Absent such an exception, the defendant's application filed June 26, 2017, is untimely.

The only exception referred to above to this case is that provided by Louisiana Code of Criminal Procedure article 930.8(A)(6), which allows consideration of an otherwise untimely application for post conviction relief if "the petitioner qualifies for the exception to timeliness in Article 926.2." This exception is commonly called the factual innocence exception.

This most recent legislatively approved exception became effective August 1, 2021, and is found in Louisiana Code of Criminal Procedure article 926.2(A). It provides as follows:

> A petitioner who has been convicted of any offense, may seek post conviction relief on the grounds that he is factually innocent of the offense for which he was convicted. A petitioner's first claim of factual innocence pursuant to this Article that would otherwise be barred from review on the merits by the time limitation provided in Article 930.8 or the procedural objections provided in Article 930.4 shall not be barred if the claim contained in

110

an application for post conviction relief filed on or before December 31, 2022, if the petitioner was convicted after a trial completed to verdict. This exception to Articles 930.4 and 930.8 shall apply only to the claim of factual innocence brought under this Article and shall not apply to any other claims raised by the petitioner. And application for post conviction relief filed pursuant to this Article by a petitioner who pled guilty or nolo contendere to the offense of conviction…shall be subject to Article 930.4 and 930.8.

In this case, Mr. Malbrough was convicted after a trial completed to verdict. He has asserted a timely claim of factual innocence. Part B of Article 926.2 details the burden placed upon a defendant who assets such a claim of factual innocence:

B. (1)(a) To assert a claim of factual innocence under this Article, a petitioner shall present new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:

(i) Scientific, forensic, physical, or nontestimonial documentary evidence.

(ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of the Subsubparagraph.

(b) To prove entitlement to relief under this Article, the petitioner shall present evidence that satisfies all of the criteria in Subsubparagraph (a) of this Subsubparagraph and that, when viewed in light of all the relevant evidence, including the evidence that was admitted at trial and any evidence that may be introduced by the state in any response that it files or at any evidentiary hearing, proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.

(2) A recantation of prior sworn testimony may be considered if corroborated by the evidence required by Subsubparagraph (1)(a) of this Paragraph. However, a

111

> recantation of prior sworn testimony cannot form the sole
> basis for relief pursuant to this Article.

By way of the amended indictment filed in this matter on April 24, 2013, the defendant was accused of the aggravated rape "of a juvenile, A.V., DOB: 7-26-02," between September of 2010 and June of 2011. It was revealed at trial that A.V. is the defendant's daughter, who was not quite eleven years old at the time of trial.

At the defendant's trial conducted June 10 through June 13, 2013, the state offered evidence of the defendant's guilt, including two pre-trial videotaped recordings of interviews of the defendant's daughter at the Children's Advocacy Center and the in-court testimony of the child. On June 12, 2013, A.V. testified that the defendant had her perform oral sex upon him.

At the evidentiary hearing in this matter on September 21, 2022, A.V., now age 20, testified that her statements in and out of court nine years previously were the result of pressure put upon her by law enforcement and her counselor, whom she claimed were not satisfied with her initial denials of any inappropriate activity on the part of her father. At the recent hearing, she testified that there never was any oral sexual intercourse of any kind between her and her father and that her statements as a child were not true.

The first contact A.V. had with her father after his incarceration began was a letter from him to her in August, 2016. Thereafter, she received additional letters from him in September, 2016, and she and he maintained contact thereafter by mail, email, and telephone. She testified that the last communication between them was more than a year before the hearing on September 21, 2022.

The court received as evidence from the defendant, copies of two letters written by A.V., one dated September 25, 2016, directed to "to whom it may concern," and one dated April 6, 2017, addressed to the undersigned judge. The testimony of A.V. at the evidentiary hearing on September 21, 2022, confirmed that she wrote these letters after she began communicating with her father who was in prison. She also confirmed that the communications to her from her father expressed an interest in helping her financially if he was released from prison, particularly with the purchase of a vehicle and the payment of school tuition.

The court has reviewed the letters of September 25, 2016, and April 6, 2017 written by A.V. The first letter is clearly a recantation of her trial

112

testimony. The second letter is a declaration by her that her father "is innocent in his charges against me," and a plea to the court that he be allowed to "come home" and share her sixteenth birthday.

Travis Theriot, the current Houma Police Department chief of detectives who was the case agent at the time of the defendant's arrest in 2012, testified at the evidentiary hearing in this matter. He reported that shortly before April 2, 2020, when A.V. was seventeen years old, she initiated a telephone call to him telling him that she wanted to talk to him. On April 2, 2020, A.V. met with Detective Theriot who conducted a videotaped interview with her. The court received the videotape as evidence. During her interview with Detective Theriot, A.V. admitted that her original trial testimony was true and that her recantation was false.

As pointed out hereinabove, a claim of factual innocence must be supported by evidence that, as a threshold matter, is "new, reliable, and noncumulative," and "was not known or discoverable at or prior to trial." The court assumes for purposes of argument that the evidence offered by the defendant in connection with his current claim, i.e., the testimony of A.V. that the defendant did not have her perform oral sex upon him, is noncumulative, and legally admissible at trial. However, in light of A.V.'s 2020 repudiation of her previous recantation, coupled with her reassertion of the recantation at the evidentiary hearing on September 21, 2022, the court does not consider her most recent testimony reliable. As a result, the defendant cannot pursue a claim of factual innocence based on her most recent testimony.

Even if this court were to consider A.V.'s recantation reliable, it could not serve as a basis for a post conviction relief claim of factual innocence. Under Code of Criminal Procedure article 926.2(B)(1) and (2), the testimonial evidence which the defendant suggests A.V. would offer at a new trial would be admissible only if it was corroborated by "scientific, forensic, physical, on nontestimonial documentary evidence." The defendant has not pointed to the existence of any such corroborating evidence that would bolster the testimony of A.V. Code of Criminal Procedure article 926.2(B)(2) specifically confirms that "a recantation of prior sworn testimony cannot form the sole basis for relief" with regard to a claim of factual innocence.

> For all of the foregoing reasons, the defendant's second post-conviction relief application has been dismissed and all relief sought therein has been denied.[129]

Petitioner's related writ applications were then likewise denied by the Louisiana First Circuit Court of Appeal,[130] and the Louisiana Supreme Court thereafter refused to consider his writ application because it was not timely filed.[131]

In its answer, the state argues that the state courts denied this claim based on independent and adequate state procedural grounds, and, therefore, the claim is procedurally defaulted for the purposes of this federal proceeding.[132] However, that

---

[129] Rec. Doc. 25, pp. 1538-43.

[130] Rec. Doc. 25, pp. 1551-52; *State v. Malbrough*, No. 2022 KW 1378, 2023 WL 2663408 (La. App. 1st Cir. Mar. 27, 2023) ("**WRIT DENIED ON THE SHOWING MADE.** Relator failed to include a copy of the transcript and/or minute entries from the evidentiary hearing on his application for postconviction relief, exhibits introduced at the hearing, any other pertinent minute entries and/or transcripts from his trial, the state's response to relator's application for postconviction relief, and any other portions of the district court record that might support the claims raised in the writ application."); *State v. Malbrough*, No. 2023 KW 0390, 2023 WL 4559870 (La. App. 1st Cir. July 17, 2023) (writ denied without reasons assigned).

[131] Rec. Doc. 25, p. 1553; *State v. Malbrough*, 373 So. 3d 445 (La. 2023) ("Writ application not considered. Not timely filed. See Louisiana Supreme Court Rule X, § 5(a).").

[132] Rec. Doc. 20, pp. 10-13. The United States Fifth Circuit Court of Appeals has explained:

> The procedural default doctrine, resting on our confinement to review of federal questions, precludes federal habeas review when the last reasoned state court opinion addressing a claim explicitly rejects it on a state procedural ground. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). When the state court has relied on an independent and adequate state procedural rule, federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

procedural defense need not be considered because the claim can more easily be denied on the merits for the following reasons.[133]

First, to the extent that petitioner is arguing that the Louisiana state courts misapplied Louisiana Code of Criminal Procedure article 926.2 in denying him relief, that claim is not cognizable on federal habeas review. As already explained repeatedly herein, federal habeas corpus relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice. 28 U.S.C. § 2254; *Engle v. Isaac*, 456 U.S. 107, 119 (1983). Issues of state law are the province of the state courts. *See, e.g., Levy Gardens Partners 2007, L.P. v. Commonwealth Land and Title Insurance Co.*, 706 F.3d 622, 629 (5th Cir. 2013) ("The principle that state courts are the final arbiters of state law is well-settled."); *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991) ("We will not review a state court's interpretation of its own law in a federal habeas corpus proceeding. We do not sit as a 'super' state supreme court in such a proceeding to review errors under state law." (internal citation and quotation marks omitted)).

---

*Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999). *See also* Brian R. Means, Federal Habeas Manual § 9B:1 (2024).

[133]A federal habeas court may pretermit a ruling on whether a claim is procedurally barred when, as here, the claim clearly fails on the merits. *See Glover v. Hargett*, 56 F.3d 682, 684 (5th Cir. 1995); *Wiley v. Puckett*, 969 F.2d 86, 104 (5th Cir. 1992); *Corzo v. Murphy*, Civ. Action No. 07-7409, 2008 WL 3347394, at *1 n.5 (E.D. La. July 30, 2008). *See also* Brian R. Means, Federal Habeas Manual § 9B:5 (2024) ("[W]here the procedural default question is relatively complicated or when relief is due to be denied even if claims are not procedurally barred, a federal court is authorized to skip over the procedural default issue and proceed to deny the claim on the merits.").

Second, to the extent that petitioner is arguing that he is entitled to habeas relief under federal law because the victim's belated recantation purportedly shows that he is in fact innocent of the aggravated rape charge, he is incorrect. "[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – **not to correct errors of fact**." *Herrera v. Collins*, 506 U.S. 390, 400 (1993) (emphasis added). As a result, "actual-innocence is *not* an independently cognizable federal-habeas claim." *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006) (emphasis in original); *accord In re Palacios*, 58 F.4th 189, 190 (5th Cir. 2023); *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (collecting cases).

Lastly, based on the manner in which petitioner has phrased his claim, it appears that he may be attempting to circumvent the foregoing prohibition on "actual innocence" claims by recasting his claim as one alleging a denial of a specific constitutional guarantee, namely, the right to due process. Specifically, as noted, he argues that "his right to a fair trial was violated due to newly discovered evidence where prosecutor's key witness recanted her trial testimony."[134] That ploy fails for the following reasons.

The victim's recantation in the instant case occurred long **after** petitioner's trial, and, even if that recantation were credible,[135] there is simply no evidence

---

[134] Rec. Doc. 5, p. 17.

[135] However, "[t]his circuit has long viewed recanting affidavits with extreme suspicion." *Summers v. Dretke*, 431 F.3d 861, 872 (5th Cir. 2005) (quotation marks omitted). Moreover, as noted, the state court in this case expressly found that the victim's recantation was not credible, and such credibility determinations are entitled

whatsoever indicating that the state knew the victim was testifying falsely **at trial**. That alone dooms this attempted characterization of the claim as a due process violation, because the United States Supreme Court has never held that a conviction based on false testimony violates a defendant's right to a fundamentally fair trial where the state was **unaware** that the trial testimony was false. *Pierre v. Vannoy*, 891 F.3d 224, 227-28 (5th Cir. 2018); *see also Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002) ("[D]ue process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured …."); *Jones v. Director, TDCJ-CID*, Civ. Action No. 1:19-cv-284, 2022 WL 18396205, at *6 (E.D. Tex. Aug. 31, 2022) ("To the extent Petitioner may argue that the unknowing use of false testimony violates the Due Process Clause, and assuming, *arguendo*, that the claim is not procedurally barred, such claim is without merit. No Supreme Court case holds that the state's unknowing use of false testimony violates the Due Process Clause. Thus, to the extent Petitioner may attempt to argue that the state unknowingly presented false testimony, he fails to allege a federal constitutional error." (citation omitted)), *adopted*, 2023 WL 318464 (E.D. Tex. Jan. 18, 2023).

    In summary: (1) Any claim that the Louisiana state courts misapplied the **state law** concerning "actual innocence" claims is not cognizable in a federal habeas

---

to substantial deference on federal habeas review and are presumed correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Coleman v. Quarterman*, 456 F.3d 537, 541 (5th Cir. 2006); *Summers*, 431 F.3d at 871 ("[W]here, as here, the state habeas court has made a credibility determination, that finding is also afforded deference under AEDPA.").

proceeding. (2) A federal "actual innocence" claim is not an independent ground for relief in a federal habeas proceeding. (3) Here, there is no evidence that the prosecution knew the victim was testifying falsely at trial, and the prosecution's **unknowing** use of false testimony does not violate a defendant's due process right to a fair trial.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Cliff Malbrough be **DISMISSED WITH PREJUDICE.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this 20th day of August, 2024.

**EVA J. DOSSIER**
**UNITED STATES MAGISTRATE JUDGE**